In re Barbara FERRIS, a/k/a Joan Ferris and B. J. Ferris.

In re Maurice FERRIS et al.

In re FERRIS ENTERPRISES, INC., a corporation, also doing business as Spectro Theatres and as Lancer Construction Company, Bankrupts.

David T. DARBY, Trustee, Plaintiff-Appellee,

v.

W. P. ATKINSON, Defendant-Appellant.

Nos. 74–744, 74–743 and 74–765.

United States District Court, W. D. Oklahoma.

March 2, 1976.

Norman Reynolds, and Terry Tippens, Oklahoma City, Okl., for plaintiff-appellee.

Richard R. Bailey, Oklahoma City, Okl., for defendant-appellant.

## ORDER

DAUGHERTY, Chief Judge.

This is an appeal by W. P. Atkinson (Appellant) from an Order entered by the Bankruptcy Court in the captioned Bankruptcy case invalidating his termination of a lease held by the Bankrupts. Jurisdiction is based upon 11 U.S.C. § 67(c). The appeal is taken pursuant to Bankruptcy Rules 801–814.

Appellee, Trustee in Bankruptcy for Bankrupts Ferris Enterprises, Inc., Maurice Ferris, and Barbara Ferris, brought an action in the Bankruptcy Court for an Order allowing him to sell all or part of certain leasehold estates held by the Bankrupts. Among these leaseholds was a tract of land which the Bankrupts had leased from Atkinson and on which they had constructed a

twin theater and restaurant complex. Atkinson terminated this lease for non-payment of rent shortly before the Bankrupts' petitions in bankruptcy were filed. Atkinson contended in the Bankruptcy Court that he was entitled to ownership of the subject lease and improvements thereon as the lease had been properly terminated prior to the bankruptcy. However, the Bankruptcy Court held that the Trustee was entitled to ownership of the lease subject only to Atkinson's right of payment for past due rents. The Bankruptcy Court entered an Order allowing the Trustee to sell the lease and Atkinson appeals from that Order herein. Another Appellant, the First National Bank of Midwest City, Oklahoma has been satisfied and has withdrawn its appeal.

The facts of this case are essentially undisputed as it was submitted to the Bankruptcy Judge on a Stipulation of Fact and the testimony of one witness. Bankruptcy Rule 810 provides that the Court shall accept the Referee's (Bankruptcy Judge) findings of fact unless clearly erroneous. The Appellant sets out several objections to the Bankruptcy Judge's findings of fact. These objections are largely matters of semantics and do not affect the operative facts of the case. Under the clear error rule the Court concludes that the Bankruptcy Judge's findings of fact are correct. However, due to the nature of this case, the Court will refer to the parties' Stipulation of Fact and the Bankruptcy Judge's summary of evidence filed in connection with this appeal as such additional facts will clarify the issues.

On October 29, 1968 Ferris Enterprises leased the subject property from Atkinson. The lease provided for a 25 year term with a 25 year renewal option. Simultaneously Charles Ferris and Maurice Ferris personally guaranteed the lease.

The purpose of the lease was to allow Ferris Enterprises to improve the property and operate a theater thereon. In order to obtain financing for this project Ferris Enterprises, with Atkinson joining only to subordinate his land interest, executed a mortgage and note to Local Federal Savings and Loan Association of Oklahoma City, Okla-

homa in the amount of $225,000.00. The Bankrupts then constructed a twin theater and restaurant on the lease. The cost to build the theater was $259,920.60 and the cost to build the restaurant was $139,795.80. An additional $104,000.00 was spent to equip the theater. This equipment was covered by a note and security agreement in favor of the First National Bank of Midwest City, Oklahoma. After completion of the improvements Bankrupts subleased the restaurant to Kips for $1,516.67 per month plus a percentage of the gross. Bankrupts operated the theater. The Bankrupts were obligated to make monthly payments, apparently $2,418.00, on the Local Federal mortgage. The Bankrupts' lease with Atkinson provided for $875.00 monthly rent for the first ten years.

The Bankrupts successfully operated the complex for a number of years. During this time they made substantial expenditures on advertising. These expenditures had the effect of enhancing the value of the theaters as a going business. The Bankrupts then experienced difficulty in their operation. They last made a monthly rent payment to Atkinson on February 22, 1974. This payment was for the October 1973 rent period. Atkinson accepted late rent payments on other occasions. By a letter dated March 25, 1974 Atkinson informed the Bankrupts that Ferris Enterprises was in default under the terms of the lease and that if default continued for a period of 30 days the landlord might, at his option, terminate the lease. Atkinson was then informed by Local Federal, in a letter dated April 24, 1974, that the Bankrupts were in default in their mortgage payments and that foreclosure proceedings would be instituted within the next 30 days if the loan was not brought current. On the same day Ferris Enterprises presented to Atkinson a check for the full amount of past due rent on the lease, $6,125.00. Atkinson accepted this check but when he presented it for payment there were insufficient funds to cover it in the account on which it was drawn. On April 25, 1974 Atkinson mailed Ferris Enterprises a letter purporting to terminate the lease. On May 1, 1974 bank-

ruptcy was filed against Barbara Ferris and Maurice Ferris. On May 7, 1974 bankruptcy was filed against Ferris Enterprises. All were subsequently adjudged to be bankrupt.

On May 17, 1974 Atkinson leased the theater to Farris Shanbour for $2,761.88 per month. On May 29, 1974 Atkinson filed an action in State Court to quiet his title to the lease and obtained an Order directing Kips to make its rent payments to him. Atkinson now makes the monthly mortgage payments of $2,418.00 to Local Federal. His gross receipts are $4,278.55 and he makes a profit of $1,860.55 per month as compared to the $875.00 per month he was making when Ferris Enterprises was operating the complex. Atkinson made certain expenditures to renovate the theater before leasing it to Shanbour, but the Trustee contends that these expenditures were unnecessary and improper. This issue was reserved by the Bankruptcy Judge.

The Bankruptcy Court concluded that it would not enforce Atkinson's termination of the lease. There were apparently three legal bases for this decision: (1) Atkinson's acceptance of rents from Kips (Bankrupts' lessee) constituted a waiver of his right to assert a termination or was an acquiescence or election to proceed with the lease; (2) Atkinson, by accepting past accruing rents waived any lease violations committed prior to the acceptance of rents and by reason of consistent acceptance of late rent payments before bankruptcy should be estopped from terminating for late payment, and (3) Atkinson's termination of the lease constituted a fraudulent transfer within the meaning of 11 U.S.C. § 107(d)(2) and the termination is therefore void. The Bankruptcy Court also cites unjust enrichment as an equitable basis for its decision. Atkinson advances three basic contentions on this appeal: (1) the lease was properly terminated; (2) the termination does not constitute a fraudulent transfer; and (3) even if the Trustee would otherwise be entitled to recover, Shanbour as a bona fide purchaser cuts off the right.

## TERMINATION

Oklahoma law governs the question of whether Atkinson properly terminated the Bankrupts' lease. See *In Re Pioneer Oil & Gas Co.*, 333 F.Supp. 1055 (E.D.La.1971). 41 Oklahoma Statutes § 6 provides:

"If a tenant, for a period of three months or longer, neglect or refuse to pay rent when due, ten days notice in writing to quit, shall determine the lease, unless such rent be paid before the expiration of said ten days."

Article Seven of the subject lease provides that:

". . . in the event Tenant defaults in the payment of the rent herein agreed to be paid by the Tenant or any portion thereof, and such default is mailed by Landlord to Tenant, * * * any such default or breach continues for Thirty (30) days after written notice thereof is mailed by Landlord to Tenant, then * * Landlord, at its option, may terminate this lease by mailing written notice thereof to Tenant, and thereupon enter the premises * * * expel Tenant, and take possession of Tenant's equipment, fixtures, etc., and do so with them as he sees fit, or re-let said premises to other interested party or parties."

The evidence shows that by letter dated March 25, 1974 Atkinson notified Maurice Ferris, President of Ferris Enterprises, that Ferris Enterprises was six months in arrears on its rent payments, and brought the above quoted Article Seven of the lease to the attention of Ferris. In a letter dated April 25, 1974 Atkinson notified Ferris that the lease was seven months in arrears and that he was exercising his option to terminate under Article Seven of the lease. This letter directed Ferris to quit the premises.

Where it is provided by the terms of a lease that the breach of one or more of the covenants of the lease authorizes a termination of the tenancy, the lessor may terminate the lease on the occurrence of such breach. 51C C.J.S. Landlord and Tenant § 104a. If a lessor desires to terminate a lease for breach of covenant he must

manifest his intent by some clear and unequivocal act, thereby giving the lessee notice of his intention. Notice of default and intent to terminate must be given in accordance with the provisions of the lease. 51C C.J.S. Landlord and Tenant § 114(3). Where the right to forfeit a lease for breach of covenant or condition is enforced, the lease is thereby terminated and the termination is effective as to the estate of a sublessee of the lessee. 51C C.J.S. Landlord and Tenant § 116. A lessor has the option whether to terminate the lease for the breach of a covenant contained therein or he may waive his right to terminate for such breach. 51C C.J.S. Landlord and Tenant § 117(6)(d). A landlord's right to terminate a lease for breach of covenant is waived if the lessor does not avail himself of the right or if there is an unreasonable delay in enforcement thereof. Any act of the lessor, done with knowledge of the violation of a covenant by the lessee, affirming the existence of the lease and recognizing the lessee as his tenant, or otherwise inconsistent with the intention to declare a forfeiture is a waiver of such forfeiture unless rebutting circumstances are shown. Inasmuch as terminations are not favored, slight acts will be construed as waivers of terminations. 51C C.J.S. Landlord and Tenant § 117(3). As a general rule, the acceptance by a landlord of rent accruing after the breach of a covenant in a lease by a lessee constitutes a waiver of the landlord's right to terminate the lease. However, a landlord's waiver of rent accruing before such a breach does not constitute a waiver. 51C C.J.S. Landlord and Tenant § 117(4). Where the cause of a termination is a continuing breach, or the breach of a continuing covenant, such as a covenant to pay rent, the waiver of one breach, as by the acceptance of rent accruing after the breach, does not destroy the breached covenant, or waive subsequent breaches thereof, such waiver acting only to discharge a particular breach. 51C C.J.S. Landlord and Tenant § 117(6)b.

In this case Ferris Enterprises last made a monthly rental payment on February 22, 1974. This payment was credited to the October 1973 rent. On March 25, 1974 Atkinson notified Ferris that it was in default under the lease for non-payment of rent for the last six months. He informed Ferris that he might exercise his option to terminate. On April 24, 1974 Ferris presented Atkinson with a check for the full amount of back due rent but there were insufficient funds on deposit to cover the check when it was presented. On April 25, 1975 Atkinson terminated the lease. After terminating the lease Atkinson brought a quiet title action and obtained an order from the State District Court ordering Ferris' tenant to pay its rent to him.

The Bankruptcy Court concluded that Atkinson's acceptance of rent from Ferris' tenant constituted a waiver of his right to terminate for back rent. However, it appears that if Atkinson properly terminated the lease the sub-tenant's lease would also be terminated and any subsequent possession by that tenant would be a tenancy at will. 41 Oklahoma Statutes § 1. Atkinson's acceptance of rent from Kips is not inconsistent with an intent to terminate the lease of Ferris.

The second basis for the Bankruptcy Judge's decision that the lease was not terminated was that Atkinson by accepting post-accruing rent and by consistently receiving late rent payments waived the right to terminate the lease. This determination is difficult to understand. The last rental payment was made on February 22, 1974 and was credited to Ferris' October 1973 rent. Thereafter no payment of rent was made unless the presentation of a worthless check can be deemed to be payment. Even if the February 22, 1974 payment was credited to the February 1974 rent Ferris would still have been in default when Atkinson mailed the March 25, 1974 notice of default. Thus, it is not possible to say that Atkinson accepted post accruing rents. On the other hand, the acceptance of late rent payments does not preclude a lessor from thereafter terminating a lease for non-payment of rent, although such conduct could be deemed a waiver of prompt payment. In this case there was not a

termination for late payment, but a termination for non-payment for seven months. Thus, prior acceptance of late rent did not preclude Atkinson from terminating for non-payment of rent.

In view of the foregoing discussion the Court finds and concludes that, as a matter of State law, Atkinson properly terminated Ferris' ground lease.

### FRAUDULENT TRANSFER

The third basis for the Bankruptcy Judge's decision was that the lease termination constituted a fraudulent transfer within the meaning of the Bankruptcy Act.

11 U.S.C. § 107(d)(2) provides that:

"Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; or (b) as to then existing creditors and as to other persons who become creditors during the continuance of a business or transaction, if made or incurred without fair consideration by a debtor who is engaged or is about to engage in such business or transaction, for which the property remaining in his hands is an unreasonably small capital, without regard to his actual intent; or (c) as to then existing and future creditors, if made or incurred without fair consideration by a debtor who intends to incur or believes that he will incur debts beyond his ability to pay as they mature . . . ."

There must be a concurrence of the following three elements for a transaction to constitute a fraudulent transfer within the meaning of the above section: (1) there must be a transfer within one year prior to the filing of a petition in bankruptcy; (2) the transfer must be without fair consideration; and (3) the debtor must thereby be rendered insolvent; or the debtor must be engaged in or about to engage in a business

transaction for which the property remaining in his hands is an unreasonably small capital; or the debtor must incur, or believe that he will incur, debts beyond his ability to pay.

With regard to element (1) *supra,* it is clear that the subject termination occurred within one year prior to the filing of a petition in bankruptcy. However, the question remains whether the termination of a lease is a "transfer". 11 U.S.C. § 1(30) states that:

" 'Transfer' shall include the sale and every other and different mode, direct or indirect, of disposing of or of parting with property or with an interest therein or with the possession thereof or of fixing a lien upon property or an interest therein, absolutely or conditionally, voluntarily or involuntarily, by or without judicial proceedings, as a conveyance, sale, assignment, payment, pledge, mortgage, lien, encumbrance, gift, security, or otherwise . . . ."

Thus, it appears that the termination of a lease by a lessor for the breach of a covenant contained therein is a "transfer" within the meaning of 11 U.S.C. § 107(d).

With regard to element (3), the Bankruptcy Court found that the debtors were insolvent at all times during the three months prior to bankruptcy; that there were numerous creditors who existed at the time of the lease termination who continued as creditors during bankruptcy; that the transfer occurred while the debtor was engaged in a business for which the remaining capital was unreasonably small; and that the Bankrupt believed that it would have debts beyond its ability to pay if the leasehold was lost. These findings of fact do not appear to have a specific basis in the Stipulation of Fact or the summary of evidence. However, as these findings were not appealed the issue of their correctness is not before the Court. 11 U.S.C. § 67(c). Taking these facts as true, the Court finds and concludes that element (3), insolvency is satisfied.

The remaining element of 11 U.S.C. § 107(d)(2) is fair consideration. This is the

issue which was extensively argued before the Court and the issue which forms the crux of this appeal.[1] 11 U.S.C. § 107(d)(1)(e) provides that

". . . consideration given for the property or obligation of a debtor is 'fair' (1) when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied, or (2) when such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained."

As the debtor's property, the lease, was not given to secure a debt, present or antecedent, and as no property was transferred in exchange therefor, the applicable provision of the above statute is that: consideration given for the property of a debtor is fair when, in good faith, a fair equivalent therefor is given for the transfer or an antecedent debt is satisfied.

▮ Whether a fair consideration has been given for a transfer depends on all the circumstances of a case. Thus, whether the surrender of a lease is made for fair consideration depends on whether a good bargain is being given up or a burdensome obligation is being discharged. 4 Collier on Bankruptcy, 14th ed. § 67.33.

▮ In this case the evidence relevant to the value of the Bankrupts' interest in the lease is as follows: The cost of constructing the twin theater building was $259,920.60; the cost of constructing the restaurant building was $139,795.80; an additional $104,000.00 was spent on equipping the theater. This total is approximately $530,000.00. Ferris and Atkinson executed a mortgage in the amount of $225,000.00 to finance construction of these improvements. By November 8, 1974 the unpaid balance of this mortgage had been reduced to $196,221.21. The equipment put into the theater was covered by a note and security agreement in the amount of $104,000.00. By April 1974 the balance due on the note had been reduced to $18,102.60. Atkinson insured the theater for $220,950.00 and the restaurant for $122,400.00. The Bankrupts spent considerable sums in advertising the theater. These expenditures had the effect of enhancing the value of the theaters as a going business. Bankrupt Maurice Ferris testified that the cost of constructing the improvements had been $20 per square foot and that the cost of construction would be much higher today. He further testified that the building (theater and restaurant) was worth more than what was in it.[2]

▮ The Bankruptcy Court concluded that the two buildings had a value of at least $343,000.00 and that the Bankrupts' equity in the buildings was at least $147,000.00. The Bankruptcy Judge's finding as to the value of the buildings is supported by Maurice Ferris' testimony that the buildings were worth more than what was in them. This evidence shows a value of approximately $400,000.00. The unpaid balance of the notes and mortgages on the buildings and equipment was $214,000.00. There is no evidence as to the value of the equipment at time of transfer. If the balance due on the equipment and buildings is subtracted from the value of the buildings alone (because the value of the equipment at time of transfer is unknown) a balance of approximately $129,000.00 is found. This was the Bankrupts' minimum equity in the complex at time of transfer and this was obtained by Atkinson by the termination of the lease. What Atkinson gave up is the right to receive monthly rent payments of $875.00 from the Bankrupts, the right that the Bankrupts make monthly mortgage payments and approximately $6,000.00 in

1. Appellee contends that the issue of the value of the Bankrupts' equity in the complex was not appealed. Bankruptcy Rule 806. However, the Bankruptcy Judge found that the transfer was without fair consideration and Appellant appeals this finding. The value of the Bankrupts' equity is embraced within this issue. This contention of Appellee is without merit.

2. An owner of real property is competent to testify as to its value. III Wigmore on Evidence § 714; *Arkansas Louisiana Gas Company v. Ackley*, 410 P.2d 35 (Okl.1965).

back rents then due him. After termination Atkinson re-leased the theater and began collecting rents from the restaurant. He then netted $1,860.00 per month as opposed to the $875.00 he received when Ferris was still in possession.

In view of the above the Court finds and concludes that the Bankruptcy Judge's conclusion that the termination was not for fair consideration is not clearly erroneous or incorrect as a matter of law. Atkinson gained an equity of the Bankrupts with a value of at least $129,000.00 for a loss of approximately $6,000.00 in rents, the right to receive monthly rent from Ferris, and the right that Ferris make monthly mortgage payments. But Atkinson by getting possession of the property also got the right to receive the income therefrom. What Atkinson got by the termination far outweighs what he gave up. Atkinson immediately re-leased the theater and got the rent from Kips and now nets $1,860.00 per month as opposed to $875.00. This shows that the lease was a good bargain and not a burdensome obligation. The finding and conclusion of the Bankruptcy Judge that Appellant did not part with a fair consideration for the transfer of the leasehold is not clearly erroneous.

### BONA FIDE PURCHASER

 Atkinson's final contention herein is that the rights of Farris Shanbour as a bona fide purchaser cut off the rights of the Trustee to recover the Bankrupts' leasehold estate. This point was not raised in the case in chief below but was raised in Appellant's Motion for New Trial. 11 U.S.C. § 107(d)(6) provides in part:

> "A transfer made or an obligation incurred by a debtor adjudged a bankrupt under this title, which is fraudulent under this subdivision against creditors of such debtor having claims provable under this title, shall be null and void against the trustee, except as to a bona fide purchaser, lienor, or obligee for a present fair equivalent value . . ."

The term "bona fide purchaser" clearly imports one who purchases for value, in good faith and without notice of adverse claims. See 11 C.J.S. Bona Fide p. 387; 12A Oklahoma Statutes § 8–302. In this case it is clear that Shanbour had notice of a possible adverse claim by the Bankrupts or their Trustee. In his Second Amended Answer Shanbour states that he attended a public sale at the Appollo Twin Theater where he purchased all personal property, fixtures, and equipment therein from the First National Bank of Midwest City, Oklahoma. This would certainly give Shanbour at least inquiry notice as to the financial difficulty of Atkinson's previous lessee.

 Moreover, 11 U.S.C. § 107(d)(6) requires that a "bona fide purchaser" give a present fair equivalent value to come within the Statute's protection. Attached to Shanbour's Second Amended Answer is a copy of the instrument whereby he leased the Appollo Twin Theater from Atkinson. The lease is for a seven month term for a total of $19,333.16. This can hardly be said to be a fair equivalent value for the theater. Any renewal of the lease would, due to these proceedings, be with clear notice of the adverse claim of the Trustee. Accordingly, Shanbour would fail to qualify for the bona fide purchaser exemption of 11 U.S.C. § 107(d)(6).

AFFIRMED.