In re Judith Lynne MADRID, Debtor.

Judith Lynne MADRID, Plaintiff,

v.

DEL MAR COMMERCE COMPANY, a California Corporation; Lawyers Title Insurance Corporation, a Virginia Corporation, Donald Turney, an individual; and DOES I through V, inclusive, Defendants.

Bankruptcy No. 81–00038.
Adv. No. 81–0003.

United States Bankruptcy Court,
D. Nevada.

May 1, 1981.

---

**6.** Similarly, I recognize but disagree with the conclusions reached in the cases cited in note 4, *supra*.

**796**

Alan R. Smith, Miller & Daar, Reno, Nev., for plaintiff.

Timothy J. Henderson, Henderson, Nelson & Moschetti, Reno, Nev., for Del Mar Commerce Co. & Lawyers Title Insurance Corp.

Roger A. Bergmann, Reno, Nev., for Donald Turney.

## JUDGMENT AND NOTICE OF HEARING ON LIENS

BERT M. GOLDWATER, Bankruptcy Judge.

The Court having rendered its Opinion and Decision which states findings of fact and conclusions of law, and good cause appearing, Judgment is hereby entered that:

1. The foreclosure sale of plaintiff's residence at 1528 Debra Lane, Incline Village, by defendant Lawyers Title to defendant Don Turney is hereby rescinded and the trustee's deed recorded as Document No. 717630 on January 13, 1981 with County Recorder of Washoe County, Nevada, is cancelled.

2. A hearing to establish the lien rights of the holder of the second deed of trust and defendants for principal, interest, costs, taxes, insurance premiums, and attorney fees is hereby set for Wednesday, May 6, 1981, at 10:00 a. m.

## OPINION AND DECISION

This is an action by a Chapter 11 debtor to set aside a transfer of her residence by a nonjudicial foreclosure sale upon the grounds that (1) she did not receive notices of default and sale pursuant to N.R.S. 107.-080 and 21.130, and (2) the sale is a voidable transfer under 11 U.S.C. § 548(a)(2)(A) and (B)(i).

In late summer 1979, debtor, Judith Lynne Madrid (Judith), and her husband, Al Madrid (Al), decided to purchase a family residence as part of a property settlement agreement in which Al was to quitclaim his interest in the residence to Judith but continue to make the payments on the residence.[1] In September 1979, Judith and Al purchased a home at 1528 Debra Lane, Incline Village, Nevada, from George G. Sayre/Pulver Co. (Sayre/Pulver) for $290,-000. Sayre/Pulver asked $125,000 down and was willing to accept a one-year note secured by a first deed of trust for the balance of $165,000. The Madrids arranged through Del Mar Commerce Company of Oakland, California (Del Mar), to borrow $142,500 for the cash down payment from one Laurel Blum to be secured by a second deed of trust.[2] Del Mar was trustee of record in the second deed of trust until August 12, 1980, when Lawyers Title Insurance Corporation of Reno, Nevada (Lawyers), was substituted as trustee.[3] The ad-

---

1. The testimony shows that the parties had been separated since 1977, and were buying a house in order to settle certain of their affairs before filing for divorce.

2. The disposition of the balance of $17,500 remaining after the cash down payment of $125,-000 is unknown.

3. Debtor was not given notice of the substitution of trustees, but the lack of notice is not relevant as will later appear.

dress given in the deed of trust for the trustor was 1528 Debra Lane.[4]

On September 4, 1979, Al quitclaimed his interest in the home to Judith. Escrow closed October 1979.

In January 1980, Judith rented Post Office Box No. 5926 at the Incline Village Post Office for one year and received the key. Soon thereafter, Al took the key away from her. In March 1980, Judith rented Post Office Box No. 6647, but did not advise the Incline Village Post Office to transfer her mail from Box No. 5926 to Box No. 6647. In October 1980, debtor became concerned she was not receiving her mail at Box No. 6647 and obtained another key to Box No. 5926. She kept the new key to Box No. 5926 until mid-November when she learned that a criminal investigation against her husband was pending, and, out of fright, threw away the key.[5]

Debtor contends that she gave Del Mar her 6647 Post Office Box Number during a telephone call on November 19, 1980. Although Del Mar's witness testified that Del Mar has no record of such a telephone call, the Court finds that Del Mar knew as of November 19, 1980 that debtor wished to receive her mail at Post Office Box No. 6647.

There were frequent defaults on the payments due under the first deed of trust, but the first few defaults were cured.[6] Default on the payment due under second deed of trust was made within a few months after the close of escrow. On June 19, 1980, debtor made a $75,300 principal payment on the second deed of trust, and signed a Modification and Extension Agreement which provided for a three-month extension for payment of principal to January 31, 1981, and an increased monthly interest pay-

ment.[7] After that payment, there was a principal balance of $67,200 with interest of $1,416.45 due on July 1, and interest of $840 per month due on the first day of each month thereafter. When debtor failed to pay the installments of interest due July 1, August 1, and September 1, the holder of the second deed requested Lawyers begin foreclosure proceedings.

Notice of default and election to sell the property under the second deed of trust was recorded September 10, 1980. A copy of the notice was mailed on that date, certified mail, to debtor at 1528 Debra Lane. That notice was returned unclaimed with the number "5926" written on the envelope. On October 6, 1980, another copy was sent certified mail to debtor at Post Office Box No. 5926. Notices for receipt of certified mail were placed in Box No. 5926 by the Post Office at Incline on October 7 and 16. The mail was not claimed and was returned to sender October 28, 1980.

On December 16, 1980, the notice of time and place of the sale scheduled for January 9, 1981 was mailed to debtor, certified mail, at 1528 Debra Lane and at Post Office Box No. 5926. Both envelopes were returned unclaimed.

The sale was held on January 9, 1981. At the time of the sale there was approximately $175,000 due on the first deed of trust and $80,224.39 due on the second deed of trust. Defendant Turney, the only bidder at the sale, bid the amount due on the second deed of trust plus one dollar. He testified that he went to the sale prepared to bid as high as $86,500.[8] With expenses on the day of the sale, Turney planned to pay approximately $256,000 for the property. He immediately insured the improvements for fire in the amount of $325,000.

---

**4.** Although 1528 Debra Lane was given as the trustor's address, there is no street delivery in Incline Village.

**5.** One part of the criminal investigation appears to have resulted from Al's writing numerous bad checks.

**6.** Notices of default were served May 1, 1980, August 28, 1980, and October 23, 1980. At the time of the sale under the second deed of trust,

Sayre/Pulver was also proceeding with foreclosure.

**7.** Al was to make all of the payments on the promissory notes secured by the first and second deeds of trust, but failed to make any such payments.

**8.** Turney's business is to buy at foreclosures and resell. Turney was a bona fide purchaser.

In the spring of 1980, debtor listed her property with a real estate broker for sale at $395,000. Extensive exposure was given by the realtor due to the uniqueness of the property. The "nearly" new 2700 square foot residence is situated on a private road on a half-acre lot a short distance from a 250 foot private Lake Tahoe beach and pier shared by the Debra Lane homeowners.[9] The house was shown approximately twelve times, but no offers were received. Debtor terminated the realtor's listing in August 1980, but continued to try to sell the house or obtain financing until after the sale on January 9, 1980. The evidence showed that debtor was negotiating at the time of the sale with a potential buyer who had no knowledge of the sale. The buyer made a $342,000 offer for the property on January 10, 1981.

In connection with her own efforts to sell or finance, debtor requested a title report on another piece of real property from Lawyers in early November. The debtor appeared at Lawyers Reno office to request the order and the order was sent to her at Post Office Box No. 6647. That incident was not sufficient to put Lawyers on notice that debtor was using Post Office Box No. 6647 rather than Box No. 5926.

Also in connection with her efforts, debtor telephoned Jay Graves (of Del Mar) on December 24, 1980 to learn the amount due on the second deed of trust and whether or not the holder of the second would allow assumption of the debt.[10] The secretary who talked to debtor wrote a message on December 24 as follows:

Judith Madrid called. She wants extention (sic) of 1–9–81 sale because she thinks she has buyer. She is at Nevada house.

Debtor filed under Chapter 11 on January 16, 1981. Her schedules show her insolvent

financial condition. She owes in excess of $25,000 mostly for improvements on the residence,[11] and is insolvent but for the potential equity in her residence. That equity, had the house been sold for its appraised value on January 9, 1981, would have been between $125,000 and $145,000. Defendant Turney's appraiser put the fair market value of the house at $330,000.[12] Established Incline real estate brokers and plaintiff's appraiser placed the market value between $380,000 and $400,000, which the Court finds to be the fair market value on January 9, 1981.

Debtor contends she had no notices of the default or sale. Alternatively, debtor contends that even if she had constructive notice she did not have proper notice because she should have been noticed at her last known address, Post Office Box No. 6647.

Debtor also contends that the transfer of her residence to defendant Turney for approximately $256,000 was a fraudulent transfer under 11 U.S.C. § 548(a)(2)(A) and (B)(i) because the sale price was less than a reasonably equivalent value.

I.

N.R.S. 107.080 provides in part:

3. The 15- or 35-day period provided in paragraph (a) of subsection 2 commences on the first day following the day upon which the notice of default and election to sell is recorded in the office of the county recorder of the county in which the property is located and a copy of the notice of default and election to sell is mailed by certified mail with postage prepaid to the grantor or to his successor in interest at the address of the grantor or his successor in interest if known, otherwise to the address of the trust property. Such notice of default and election to sell must describe the deficiency in performance or payment

9. Defendant Turney's expert witness testified that she did not use a cost approach analysis because land with access to a private beach can no longer be found at Lake Tahoe.

10. Mr. Graves is a lawyer who represented the holder of the second deed of trust.

11. After she moved into the house debtor had the yard landscaped, added shutter, a fence, and a ballet bar which improvements definitely increased the value of the property.

12. The appraisal does not consider a cost approach analysis.

and may contain a notice of intent to declare the entire unpaid balance due and payable if acceleration is permitted by the obligation secured by the deed of trust, but acceleration must not occur if the deficiency in performance or payment is made good and any costs, fees and expenses incident to the preparation or recordation of such notice and incident to the making good of the deficiency in performance or payment are paid within the time specified in subsection 2.

4. The trustee, or other person authorized to make the sale under the terms of the trust deed or transfer in trust, shall, after expiration of the 3-month period following the recording of notice of breach and election to sell, and prior to the making of such sale, give notice of the time and place thereof in the manner and for a time not less than that required by law for the sale or sales of real property upon execution. The sale itself may be made at the office of the trustee, if the notice so provided, whether the property so conveyed in trust is located within the same county as the office of the trustee or not.

N.R.S. 21.130 provides in part:

3. Real property. In case of real property, by personal service upon each judgment debtor or by *registered* mail to the last-known address of each judgment debtor and by posting a similar notice particularly describing the property, for 20 days successively, in 3 public places of the township or city where the property is situated and also where the property is to be sold; and also by publishing a copy of the notice three times, once a week, for 3 successive weeks, in a newspaper, if there be one in the county. The cost of publication shall in no case exceed the rate for legal advertising as provided in NRS 238.070. In any case where the paper authorized by this section to publish such notice of sale neglects or refuses from any cause to make such publication, then the posting of notices as provided in this section shall be deemed sufficient notice. Notices of the sale of property on execution upon a judgment for any sum

less than $500, exclusive of costs, shall be given only by posting in 3 public places in the county, 1 of which shall be posted at the courthouse. (Emphasis added.)

As to N.R.S. 107.080 and 21.130, the issue is whether or not the statutory notices were adequate in light of the fact that they were mailed to Post Office Box No. 5926 and returned to sender unclaimed.

■ Debtor had complete access to Post Office Box No. 5926 when notice of the receipt of certified mail containing the notice of default and election to sell was placed in Box No. 5926 on October 16, 1980. Additionally, it was the debtor's responsibility to request that the Post Office transfer her mail from 5926 to 6647.

Lawyers was under no duty to search for debtor when the notices were returned unclaimed. *Turner v. Dewco Services, Inc.*, 87 Nev. 14, 479 P.2d 462 (1971). Debtor's action in throwing away the key to the box is no defense.

Although Del Mar knew debtor's last known address and failed to advise Lawyers, the issue becomes moot because it appears debtor had notice. Debtor's call to Del Mar on December 24, 1980 establishes the fact that debtor actually knew about the foreclosure sale. *Hankins v. Adm. of Veteran Affairs*, 92 Nev. 578, 555 P.2d 483 (1976).

Foreclosure was proper and in accordance with Nevada statutes.

II.

11 U.S.C. § 548(a)(2)(A) and (B)(i) provide:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—

\* \* \* \* \* \*

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred; or became insolvent as a result of such transfer or obligation;

With respect to Section 548(a)(2)(A), the issue is whether or not the price paid was a reasonably equivalent value.

Section 548(a)(2) is derived in part from Section 67(d)(2) of the former Bankruptcy Act which permitted a trustee in bankruptcy to avoid transfers by the debtor in fraud of his creditors. Bankr.Act, Sec. 67(d)(2), H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 375 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Under Section 67(d)(2), fair consideration had to be given for a transfer and fair consideration included the requirement of good faith as well as fair equivalent value. *Cohen v. Sutherland*, 257 F.2d 737 (2d Cir. 1958). Under present Section 548(a)(2)(A) and (B)(i), if the two conditions of less than reasonably equivalent value and insolvency are present, there is a conclusive presumption of fraud, any intent to the contrary notwithstanding. 4 *Collier on Bankruptcy* 543–48 (15th ed. 1980).[13] Fair consideration under former Section 67(d)(2), but for its good faith requirement, corresponds to reasonably equivalent value under Section 548(a)(2)(A).[14]

■ Cases under Section 67(d)(2) hold that fair consideration must be determined by the facts and circumstances of each case. In *In re Ferris*, 415 F.Supp. 33, 40 (W.D. Okl.1976), the Court held that the consideration was not fair in view of the facts that the mortgage had been reduced, the bankrupts had spent considerable sums which enhanced the value of the property, and the cost of replacement was estimated to be much more than the original building costs.

A case upon almost identical facts with the case at bar is *Durrett v. Washington National Insurance Co.*, 621 F.2d 201 (5th Cir. 1980). In *Durrett* there was only one bidder at the deed of trust foreclosure sale and he bid $115,400 (the exact amount necessary to liquidate the indebtedness secured by the deed of trust) for property valued at $200,000. The District Court for the Northern District of Texas (460 F.Supp. 52) held that the payment of 57.7% of the value of the property was fair consideration. The Fifth Circuit reversed stating:

We have been unable to locate a decision of any district or appellate court dealing only with a transfer of real property as the subject of attack under Section 67(d) of the Act, which has approved the transfer for less than 70 percent of the market value of the property.

In making its decision in *Durrett*, the Court relied heavily on the fact that the sale deprived the bankruptcy estate of an equity in the property of $84,600.

■ The facts in this case differ only in that the defendant Turney paid 64% to 67% of the market value of the property rather than 57.7%. The equity which the bankruptcy estate and creditors have been deprived of in this case ranges from $125,000 to $145,000. It is apparent that the Courts have established a firm 70% guideline because the greater the market value of a piece of property the more equity that can be cut off by the variation of a few percentage points.

Defendant Turney paid 64% to 67% of the market value of a very unique piece of residential property. At the time of the sale he was prepared to bid approximately $6,000 more. Immediately after the sale he insured the property for $325,000 as fire value. The debtor enhanced the value of the property with certain improvements and paid $75,300 in principal on the second deed of trust. A buyer on January 10, 1981, was willing to pay approximately $85,000 more than was paid at the foreclosure sale.

A purchase price of $256,000 in this case is not the reasonably equivalent value of the market appraisal of $380,000 to $400,000.

---

**13.** Although a nonjudicial foreclosure sale is an involuntary transfer, it clearly falls within the definition of transfer in 11 U.S.C. § 101(40). *See also Cowen v. Guidry*, 274 F.Supp. 22 (E.D. La.1967).

**14.** No cases have been found which define reasonably equivalent value under 11 U.S.C. § 548(a)(2)(A).

Let Judgment be entered rescinding the nonjudicial foreclosure sale of January 9, 1981.