**LOWER DOWNTOWN ASSOCIATES, L.P., Plaintiff,**

v.

**BRAZOSBANC SAVINGS ASSOCIATION OF TEXAS, Defendant.**

**Adv. No. 85 G 183.**

United States Bankruptcy Court, D. Colorado.

Aug. 27, 1985.

Cogswell and Wehrle by Stephen M. Bailey and Ruth M. Schley, Denver, Colo., for plaintiff.

Richard J. Spelts, P.C. by Richard J. Spelts, Denver, Colo. for defendant.

**ORDER**

JAY L. GUECK, Bankruptcy Judge.

Lower Downtown Associates, L.P. ("LDA"), as debtor-in-possession, filed this complaint against Brazosbanc Savings Association of Texas ("Brazosbanc"), seeking to avoid an allegedly fraudulent transfer order under 11 U.S.C. § 548. Trial on the complaint was held June 17, 1985. The facts are as follows:

## FACTS

On March 15, 1985, LDA executed and delivered to Brazosbanc a promissory note in the face amount of $12,000.00. This note was secured by a deed of trust encumbering certain property known as the Sheridan-Heritage Office Building and Sheridan-Heritage Garage Building. Under the terms of the original promissory note, the loan had a maturity date of September 15, 1986. In addition, commencing April 1, 1984, LDA was to make monthly principal and interest payments of approximately $150,000.00.

On March 30, 1984, the parties to the original note entered into a modification agreement. Pursuant to the terms of that agreement, the maturity date of the loan was advanced to October 1, 1984. LDA was also to provide Brazosbanc with a commitment letter from another bank or savings and loan by June 1, 1984, committing that institution to provide a loan in a sufficient amount to pay Brazosbanc off by the maturity date of the Brazosbanc loan.

LDA defaulted on its obligations and on September 20, 1984, Brazosbanc commenced foreclosure proceedings on its deed of trust. The property was sold by the public trustee for the City and County of Denver on November 14, 1984, to Brazosbanc for the bid sum of $7,000,000. It is not clear how much was owed to Brazosbanc at that time.

An involuntary petition was filed against LDA on January 25, 1985. LDA consented to the entry of an order for relief and on March 28, 1985, an order for relief was entered against LDA. On March 26, 1985, LDA filed this complaint alleging that the foreclosure sale was a fraudulent transfer within the meaning of 11 U.S.C. § 548(a)(2). The complaint sought an order transferring the property back to LDA pursuant to 11 U.S.C. § 550(a).

## LEGAL ANALYSIS

The facts presented at trial raise the oft-litigated issue of whether a non-judicial foreclosure sale may constitute a fraudulent transfer subject to avoidance under 11 U.S.C. § 548. This issue is the subject of a split of authority amount the Circuits. However, it is an issue which has not yet been addressed by the Tenth Circuit Court of Appeals.

The leading case allowing avoidance of a foreclosure sale as a fraudulent transfer is *Durrett v. Washington National Insurance Co.*, 621 F.2d 201 (5th Cir.1980). *Durrett* involved the appeal of a district court judge's determination that the price paid by a purchaser at a foreclosure sale was a "fair equivalent" within the meaning of § 67 of the Bankruptcy Act. 11 U.S.C. § 107 (repealed). The fair market value of the property was established to be $200,000. The price paid for the property was $115,400. The Fifth Circuit Court of Appeals concluded that a sales price approximately 57.7 percent of the fair market value was not the fair equivalent and reversed.

The Fifth Circuit rejected the argument that the transfer accomplished by the public trustee, pursuant to the power of sale provision of the deed of trust, was not a transfer made by the debtor-in-possession within the contemplation of § 67. The Court of Appeals noted the actual transfer of title had been made when the deed of trust had been executed, which was more than one year prior to commencement of the fraudulent conveyance action. Durrett, however, retained possession of the property. The Fifth Circuit concluded that the transfer within the contemplation of § 67 was not final until the day of the foreclosure sale.

Certain other courts have reached a similar result under § 548 of the Bankruptcy Code. *See e.g. In re Hulm*, 738 F.2d 323 (8th Cir.1984), *In re Richardson*, 23 B.R. 434 (Bankr.Utah 1982).

The leading case opposing *Durrett* is *In re Madrid*, 10 B.R. 795 (Bankr.Nev.1981), *rev'd.* 21 B.R. 424 (BAP 9th Cir.1982), *aff'd.*, 725 F.2d 1197 (9th Cir.1982), *cert. denied*, —— U.S. ——, 105 S.Ct. 125, 83 L.Ed.2d 66 (1984). The bankruptcy judge in *Madrid* followed the reasoning ex-

pressed by the Fifth Circuit in *Durrett* and rescinded a non-judicial foreclosure sale. *In re Madrid, supra,* at 10 B.R. 795, 800. The Bankruptcy Appellate Panel for the Ninth Circuit (BAP) reversed the bankruptcy judge. In an attempt to harmonize the law of fraudulent conveyances with the law of foreclosure, the BAP concluded that the consideration received at a noncollusive, regularly conducted foreclosure sale satisfies the "reasonably equivalent value" requirement of § 548. *In re Madrid, supra,* 21 B.R. at 427. The holding of the BAP made is unnecessary to address the issue of when the transfer had occurred.

The Court of Appeals for the Ninth Circuit affirmed the holding of the BAP but on a different ground. The Circuit Court held that § 548(d)(1) contains a specific definition of transfer which controls over the general definition of § 101(40). Section 548(d)(1) provides:

(d)(1) For the purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee, but if such transfer is not so perfected before the commencement of the case, such transfer is made immediately before the date of the filing of the petition.

The Ninth Circuit court concluded that the transfer which takes place in a foreclosure sale under § 548 occurs when the deed of trust is perfected under state law, not when the foreclosure sale takes place. *In re Madrid, supra,* 725 F.2d 1197, 1200. In *Madrid,* the deed of trust had been recorded more than one year prior to the commencement of the action. Thus, the Court of Appeals dismissed the action as being barred by the statute of limitations contained within § 548. The Circuit Court did not address the BAP's conclusion that a properly conducted foreclosure sale creates a conclusive presumption of "reasonably equivalent value."

Since the *Madrid* decision was rendered by the Ninth Circuit, two additional Circuit Courts have addressed this issue. The first was the Eighth Circuit Court in *In re Hulm, supra.* The Eighth Circuit rejected the Ninth Circuit's interpretation of § 548(d)(1). The Eighth Circuit found that § 548(d)(1) only determines the time when a transfer is deemed to have occurred, not whether a certain event is a transfer. In the view of the Eighth Circuit, the foreclosure of a mortgage effected a separate and distinct transfer for recordation of the deed of trust. The transfer occasioned by the foreclosure occurred at or about the time of the foreclosure sale. *In re Hulm, supra,* at 326.

The Eighth Circuit also rejected the Ninth Circuit BAP's reasoning that a regularly conducted foreclosure sale is deemed to provide reasonably equivalent value. The Eighth Circuit concluded that the determination of whether reasonably equivalent value was provided required an evidentiary hearing. The case was remanded so that such an evidentiary hearing could be conducted.

The most recent Circuit Court opinion was rendered by the Sixth Circuit Court of Appeals. *Matter of Winshall Settlor's Trust,* 758 F.2d 1136. (6th Cir.1985). The Sixth Circuit agreed with the Ninth Circuit Court of Appeals' interpretation of § 548(d)(1), and concluded that the transfer occurs when the mortgage is perfected rather than at the time of the foreclosure sale. The Sixth Circuit then went on to state that even if a foreclosure sale was subject to § 548, the better view is that expressed by the Ninth Circuit BAP. *Matter of Winshall Settlor's Trust, supra,* at 1139 (1985).

The *Durrett* line of cases has come under considerable criticism and Congress recently amended Sections 101(40) and 548 in the Bankruptcy Amendments and Federal Judgeship Act of 1984 (1984 Amendments) Pub.L. 98–353, 98 Stat. 333 (1984). Congress expanded the definition of "transfer" in § 101(40) to specifically include foreclosure of a debtor's equity of redemption.

Congress also amended § 548 to provide that an involuntary transfer could be a fraudulent transfer. 11 U.S.C. § 548(a). As originally contemplated by the sponsor of these changes, § 548 would have been further amended to provide that if a purchaser at a noncollusive foreclosure sale bid at least the full amount of the debt secured by the property, the bid would conclusively constitute reasonably equivalent value for the property. This final change to § 548, however, was not enacted.

The attorney for Brazosbanc argues that the amendments to § 101(40) and § 548 cannot be constitutionally applied to Brazosbanc in this case. Their deed of trust was executed and recorded well before the effective date of the 1984 Amendments. Brazosbanc asserts that application of §§ 202 and 548, as amended, would violate the Fifth Amendment, as a taking. *See: United States v. Security Industrial Bank*, 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982).

This argument contains two assumptions which I am not willing to accept. First, Brazosbanc indulges in an apparent concession that the 1984 Amendments weaken the reasoning expressed by the Ninth Circuit Court of Appeals in *In re Madrid, supra.* However, the legislative history of the 1984 Amendments indicates that Congress had not intended to alter the result of *In re Madrid,* or in any way to codify *In re Durrett.* Congressional Record S 13772. The Sixth Circuit also concluded that the 1984 Amendments did not affect the holding of *In re Madrid. See: Matter of Winshall Settlor's Trust, supra,* at 1138, 1139, fn. 3.

Brazosbanc's argument also assumes that this court would have followed *In re Madrid* prior to enactment of the 1984 Amendments. The only authority from the District of Colorado on this issue consists of two recent opinions by Judge McGrath, of this court. *In re Christian,* 48 B.R. 833 (Bankr.Colo.1985); *In re Garrison,* 48 B.R. 837 (Bankr.Colo.1985). In those cases,

Judge McGrath followed the reasoning of the Eighth Circuit in *In re Hulm, supra. In re Garrison, supra,* was a pre-1984 Bankruptcy Amendments case. *In re Christian, supra,* was post-Amendment. It is unnecessary for me to cast a vote in this conflict among the Circuits to resolve the issues here. Even accepting that a noncollusive, regularly conducted foreclosure sale can be the subject of a fraudulent transfer under § 548, the facts in this case establish that the debtor received reasonably equivalent value in exchange for the transfer.

The only testimony accepted by the court concerning the value of the property in question was that of Wilson Wampler, an MAI appraiser.[1] Mr. Wampler has had occasion to appraise the property three times. The first appraisal was dated May 1, 1984 and estimated the fair market value of the property to be $11,195,000.00. The next appraisal was dated November 13, 1984 and valued the property at $8,000,000.00. Mr. Wampler's final appraisal was dated May 31, 1985 and valued the property at $7,680,000.00.

The first appraisal was conducted at the request of Heritage Financial Corporation, a general partner of LDA. The subsequent appraisals were prepared for Brazosbanc. At the time the second appraisal was prepared, Mr. Wampler knew that a foreclosure of the property was pending. LDA asserts that the two latter appraisals should be disregarded. LDA claims that the low valuation figures are influenced by the client for whom the appraisal was prepared. This is probably true and cuts both ways. Nonetheless, I find the testimony here to be credible and unrebutted.

Mr. Wampler's testimony reflects that the three million dollar difference between the appraisals of May of 1984 and November of 1984 was largely due to two factors. First, the estimated cost to complete the project had increased by approximately $900,000.00. While a "cost approach" was not adopted by Wampler, the cost of com-

---

1. Attorney for Brazosbanc attempted to offer testimony from another appraiser and CPA. This testimony was rejected as being cumulative and lacking in proper foundation.

pletion was taken into consideration in completing the unfinished product so that the "income analysis" of the entire property could be utilized. Cost of completion was also considered in the "direct comparison" (comparables) analysis, since the value derived was net of completion costs. Second, the Denver rental market had suffered serious declines during that period. Both of these explanations are reasonable and logical.

The May, 1984 appraisal estimated the cost to complete the project to be $4,000,-000. This figure was based on an owner estimate of $3,900,000 and an outside contractor estimate of $4,260,000. The November, 1984 appraisal adjusted the outside contractor's estimate upward for the time which had passed and added an additional 15% margin for profit which had not been included in the May, 1984 appraisal. Thus, the cost to complete the project was adjusted upward to $4,975,000.00. I find that the reduction in value caused by the increased completion cost to be a valid adjustment. To the extent the cost to complete the project was lower in the May, 1984 appraisal, it appears to have resulted in an overvaluation of the property.

The second reason for the dramatic decline in the appraised value of the property was a general decline in the Denver rental market. The November, 1984 appraisal used a slightly lower effective rental rate and a slightly longer absorption time in estimating the value of the property via the income approach. Mr. Wampler testified that these changed assumptions were accurately reflected the Denver rental market in November of 1984. The changes in assumptions caused the estimated value using the income approach to decline from $11,195,000 in the May, 1984 appraisal to approximately $7,975,000 in the November, 1984 appraisal. Additionally, Mr. Wampler acknowledged that he had inadvertently overestimated the net rentable area by about 12,000 feet in May, and that the figure used in November, 1984 was the correct figure.

Based on the testimony of Mr. Wampler and the November 13, 1984, appraisal, I find that the value of the property at the time of the foreclosure sale to be $8,000,-000. Brazosbanc paid $7,000,000 for the property at the foreclosure sale. It is now necessary to consider whether this is reasonably equivalent value within the meaning of § 548.

The term "reasonably equivalent value" is not defined by the Code. The Fifth Circuit in *Durrett* stated it was unable to locate a decision approving a transfer for less than 70 percent of fair market value. *Durrett, supra,* 621 F.2d at 203. Thus, the so-called *"Durrett* 70 percent rule"* was born. Judge McGrath rejected this rule in *In re Garrison, supra,* and I, too, reject it. Nonetheless, it is noted that the price achieved here was 87.5% of the fair market value.

I do not now attempt to devise a formula to determine "reasonably equivalent value" in a real estate transaction. Certainly, many factors must be considered by a court in making such a determination. These factors will vary, depending upon the nature of the property—whether it is a single family dwelling, an apartment building, an office complex, a business edifice or a shopping center. Consideration should be given to rent rolls, existing lease terms, interest rates, existing rental rates in the area, holding costs, time necessary to market, marketing costs, efforts to market, existing zoning, possible changes in zoning, highest and best use, general state of the economy and any other factors relevant to the particular property and circumstances. It is difficult to compose a formalized formula for making this determination, but I have endeavored to consider all the factors presented by the litigants and discussed in the foregoing authorities.

The facts of this case illustrate one of the clearest examples of "reasonably equivalent value". Using an independent appraiser, Brazosbanc estimated the fair market value to be $8,000,000. No alternative value was presented by the debtor. The bank estimated the cost of resale and inter-

est expense incurred in holding the property for resale to be $1,000,000. Thus, the $7,000,000 bid was achieved. In retrospect, the $1,000,000 figure may have been inadequate considering the time this property has been tied up in litigation.

I find that LDA received reasonable equivalent value in exchange for the transfer of its interest in the Sheridan-Heritage Office Building and Garage. It is therefore ordered:

Judgment shall enter in favor of Brazosbanc Savings Association of Texas and against Lower Downtown Associates, L.P.

It is further ordered, Lower Downtown Associates is directed to forthwith release the lis pendens recorded in connection with this adversary proceeding.