In re Mary PINTO, Individually, and Joseph Pinto, Individually and trading as East Coast Produce, Debtors.

Mary PINTO, Individually, and Joseph Pinto, Individually and trading as East Coast Produce, Plaintiffs,

v.

PHILADELPHIA FRESH FOOD TERMINAL CORPORATION, Defendant.

Adv. No. 87–1077S.
Bankruptcy No. 87–02493S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 11, 1988.

Michael D. Power, Janet M. Sonnenfeld, Philadelphia, Pa., for plaintiffs/debtors.

Anthony R. Barone, Philadelphia, Pa., trustee.

Louis DiGiacomo, Philadelphia, Pa., for defendant.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

## INTRODUCTION

The Debtors herein seek application of § 548 of the Bankruptcy Code, relating to fraudulent transfers, to a transaction that included both the termination of their lease with the Defendant, the Philadelphia Fresh Food Terminal Corporation (hereinafter referred to as "the Defendant"), and the Defendant's effective elimination of the value of the Debtors' stock in the Defendant-corporation. The Defendant argues that, for a variety of reasons, § 548 is inapplicable to the facts involved in the present case. We conclude that § 548 can be applied to the "transfer" of the Debtors' interest in both the lease and the stock effected by the Defendant. However, we find that the Debtors have failed to establish a fraudulent transfer under § 548(a)(1) because the *Debtors* did not intend to hinder, delay, or defraud a creditor in the "transfer" in issue. The Debtors have also not satisfied §§ 548(a)(2)(A)–(B)(i) and (ii) due to their failure to establish insolvency on the date of the transfer or that the transfer left an unreasonably small amount of capital as to *them*, as opposed to their business.

## PROCEDURAL HISTORY

On May 21, 1987, a Chapter 11 Petition was filed by Mary Pinto, individually, and Joseph Pinto (hereinafter referred to as "Pinto, Sr."), individually and trading as East Coast Produce. (Mary Pinto and Pinto, Sr. are hereinafter referred to collectively as "the Debtors.") The Debtors filed their Complaint in the present Adversary Proceeding against the Defendant on December 28, 1987. An Order was entered on June 9, 1988, converting the case to Chapter 7 upon an unopposed Motion of the United States Trustee.

The Debtors' Complaint sought compensatory and punitive damages from the Defendant as the result of an alleged transfer of both its interest in a lease with the Defendant and stock held by Debtors in the Defendant-corporation. The Debtors alleged that the transfer constituted both a fraudulent conveyance under 11 U.S.C. § 548 and a preferential transfer under 11 U.S.C. § 547. The Debtors sought punitive damages for what they characterized as the Defendant's outrageous, wanton, and malicious conduct. The Defendant, through its Answer, denied that either a fraudulent or preferential transfer had occurred.

Hearings were held in this matter on April 12 and 29, 1988. In the course of those proceedings, the Debtors indicated that they would not pursue Count Two of their Complaint, alleging that a preferential transfer had occurred.

The Debtors presented testimony from Joseph Pinto, Jr. (hereinafter referred to as "Pinto, Jr."), son of the Debtors; Stanley Sussman, a former business partner of Pinto, Jr.; and Harold Goldberg, Esquire, an attorney who had represented a potential purchaser of Debtors' major assets. At the close of the Debtors' case, the Defendant moved for dismissal pursuant to Bankruptcy Rule (hereinafter "B.Rule") 7041, which motion was denied. The Defendant then called Raymond Farber, general manager of the Defendant; William T. Morgen, corporate secretary of the Philadelphia Produce Credit Bureau; and Marvin J. Levin, Esquire, who had represented the Receiver appointed in state court for East Coast Produce (hereinafter "East Coast"), as its witnesses.

By Order dated May 3, 1988, a briefing schedule was established. On June 3, 1988, and June 24, 1988, the Debtors and the Defendant made timely submissions to us supporting their respective positions. We are obliged to render our decision in the form of Findings of Fact, Conclusions of Law, and a Discussion by the terms of B.Rule 7052.

## FINDINGS OF FACT

1. The Defendant is a Pennsylvania business corporation incorporated in 1953. It leases approximately twenty (20) acres of property in South Philadelphia from the Food Distribution Center. This twenty-acre property (hereinafter referred to as "the Terminal") includes seventy-three (73) enclosed units or stalls which are leased by

the Defendant to wholesale produce merchants. The Terminal also includes two (2) restaurants and approximately one hundred (100) office tenants.

2. The merchants who lease units from the Defendant are the stockholders of the Defendant (hereinafter referred to as "the Stockholders"). Each of the Stockholders owns twenty (20) shares of stock per unit leased. None of the office tenants or restaurants are stockholders. A tenant must be actively engaged in the wholesale fruit and produce business to be a Stockholder.

3. Only Stockholders can lease produce units from the Defendant at the Terminal. However, the Defendant, by its Board of Directors (hereinafter referred to as "the Board"), may refuse to lease to even a Stockholder. A Stockholder receives no dividend payment or other benefit from stock ownership, other than the right to lease a produce unit from the Defendant. Raymond Farber, its general manager, admitted that nobody would want to buy Defendant's stock if that person could not also lease a unit.

4. Each Stockholder has signed both a store lease (hereinafter referred to as "Lease") and an Agreement Restricting Transfer of Stock (hereinafter referred to as "Stock Agreement") with the Defendant. The Lease and the Stock Agreement for each Stockholder are identical.

5. Stockholders are able to transfer their interests in their stock and leasehold with the approval of the Board. Under the Stock Agreement, a sale or transfer of stock may not be consummated without the consent, by resolution, of the Board. Also pursuant thereto, Stockholders are required to give written notice of any proposed transfer to the Defendant including the name, address, and nature of the business of the prospective buyers, and such other information concerning the prospective buyer as the Board may require. According to Farber, the Defendant generally required the following information regarding prospective buyers: (1) A financial statement; (2) The identity of the principals; and (3) If the buyer is a corporation,

then the name of the corporation; the identity of the Corporation's officers and directors; and the percentage of any stock owned by any principals.

6. When a Stockholder sells the stock, the Defendant issues a new lease and new shares of stock to the purchaser. The transferor surrenders his or her stock to the Defendant. Any consideration for the transfer is paid by the transferee to the transferor-Stockholder. Normally, no payment is made to the Defendant in a transaction involving sale of stock. The transferee-Stockholder thereafter pays monthly rental payments to the Defendant under the new lease. A diagram of the transaction would appear as follows:

```
              Defendant
Surrender of stock          issue new stock
Termination of lease        issue new lease

Transferor      consideration      Transferee
Stockholder                        Stockholder
```

All transfers of stock also involve the transfer of the transferor's leasehold at the Terminal.

7. Pinto, Sr. and Pinto, Jr. were both wholesale produce merchants at various times in their lives.

8. In or about June, 1982, Pinto, Jr. and Stanley Sussman, doing business as Angelo DiGiacomo (hereinafter referred to as "DiGiacomo"), purchased an interest in a double unit [1] at the Terminal for approximately $250,000.00. As part of this transaction, Pinto, Jr. and Sussman received forty (40) shares of Defendant's stock and a lease from the Defendant for the double unit. Pinto, Jr. subsequently terminated his involvement with this partnership.

9. In or about January, 1985, Pinto, Jr. purchased twenty (20) shares of Defendant's stock and a leasehold interest from the Defendant in unit 110 at the Terminal for $145,000.00. As part of this transaction, Pinto, Jr. also obtained three 40–foot refrigerated trailers that were attached to

---

1. A double unit is approximately twice the size of a single produce unit.

unit 110. Pinto, Jr. thereafter operated a business at this unit called Joseph Pinto & Sons.

10. Pinto, Jr. subsequently also purchased and sold twenty (20) shares of Defendant's stock and an interest in a leasehold from the Defendant in unit 112 of the Terminal. Pinto, Jr., sold his interest in unit 112 to an unrelated party for $150,000.00.

11. Pinto, Jr.'s purchase of stock and leasehold interests in units 110 and 112 were financed by Frankford Trust. As security for these loans, Frankford Trust took a security interest in the units as well as the homes of both Pinto, Jr. and the Debtors.

12. In or about May, 1986, the United States Perishable Acts Commodity Association terminated Pinto, Jr.'s license to sell produce due to "bookkeeping irregularities."

13. In or about May, 1986, Pinto, Jr. allegedly transferred his stock and interest in leasing unit 110 to Pinto, Sr., doing business as East Coast Produce Company (hereinafter referred to as "East Coast"). In that transaction, Pinto, Jr. allegedly sold his stocks and lease to Pinto, Sr. for $150,000.00, which amount was payable in monthly installments. According to the Agreement of Sale of Assets between these parties, there was also a sale of accounts receivable of Pinto, Jr.'s business to East Coast for a purchase price of $231,405.92.

14. The transfers described in paragraphs 8 through 13 *supra*, were approved by the Defendant's Board.

15. Pinto, Jr. remained active in the business of East Coast after sale of the business to Pinto, Sr.

16. In August, 1986, Pinto, Sr. suffered a stroke. In that month, East Coast ceased doing business due to financial difficulties and Pinto, Sr.'s poor health. As a result, Pinto, Sr. decided to sell the stock and leasehold interest in unit 110.

17. Pinto, Jr. negotiated for a sale of stock with Tom DiGiovanni, a principal for Tom Rob Corporation, (hereinafter referred to as "Tom Rob"), which expressed interest in buying the stock and leasing unit 110 from the Defendant.

18. On October 14, 1986, Pinto, Sr. wrote to the Board indicating his intent to sell his twenty (20) shares of stock and lease to unit 110 to Tom Rob.

19. There was never a formal written Agreement of Sale between Tom Rob and East Coast. Harold Goldberg, Tom Rob's counsel at the time, testified that Tom Rob did not want to enter into a formal Agreement of Sale until the Board approved the transfer. He further stated that Tom Rob had no interest in purchasing the stock unless it could also lease a produce unit, and that Tom Rob was willing to pay between $75,000.00 and $100,000.00 for the stock and right to lease unit 110.

20. Farber testified that he advised Pinto, Jr. that the Defendant would require a financial statement from Tom Rob.

21. In or about September, 1986, Battaglia Produce Sales, Inc. (hereinafter "Battaglia"), filed an action in equity in the Philadelphia Court of Common Pleas against Pinto, Jr. and Pinto, Sr., individually and trading as East Coast. Battaglia alleged in its Complaint that Pinto, Jr. had transferred his assets in the Defendant's establishment to his father for no consideration to avoid payment of the debt owed to Battaglia. A default judgment was taken in this case and an Order was issued on October 29, 1986, appointing Herman Mattleman, Esquire, Receiver for East Coast and ordering Pinto, Sr. to convey the business and its assets to the Receiver.

22. On November 11, 1986, the Board met. Minutes of this meeting state as follows:

> Mr. DiGiacomo advised the Board concerning East Coast Produce. Philadelphia Fresh Food Terminal Corporation will exercise its option to purchase the stock.

It is unclear from the evidence whether the proposed sale to Tom Rob was presented to the Board at this meeting. Farber testified that he would not officially report a proposed transfer to the Board unless he had received a written letter of intent and infor-

mation regarding the prospective buyers. A financial statement for Tom Rob was not received by the Defendant before the November meeting.

23. By letter dated November 11, 1986, counsel for the Defendant advised Pinto, Sr. that the Defendant was terminating his lease for unit 110 due to the following alleged defaults of such lease:

1. Appointment of a receiver for East Coast by the Court of Common Pleas of Philadelphia County, as of September Term 1986, No. 134 on October 29, 1986.

2. Your alleged insolvency and inability to meet your current obligations as they fall due.

3. Vacating the demised premises.

4. The sub-letting of the demised premised for warehousing purposes.

This letter also stated that the Defendant was exercising its option to purchase Pinto, Sr.'s twenty (20) shares of stock pursuant to the Lease and the Stock Agreement. The letter directed Pinto, Sr. to deliver his Stock Certificate to the Defendant endorsed for transfer.

24. The lease provides in pertinent part that, if the lessee becomes insolvent or a proceeding for the appointment of a receiver is filed against the lessee, then the lessee shall be deemed to have breached the lease. The lease also contained lessee's covenant not to vacate the leased premises or to use it for any purpose other than the receipt, sale, and distribution of produce.

25. Prior to the November 11, 1986, correspondence, East Coast had not received any written notice of the above alleged lease violations.

26. East Coast had continued making its regular monthly rental payments to Defendant up to and including November, 1986. The November rent check was returned to Pinto, Sr. with the November 11 correspondence.

27. Subsequent to the October 14, 1986, correspondence from Pinto, Sr., there were numerous letters and conversations between Mattleman, Goldberg, Farber, and Allen B. Dubroff, Esquire, who was representing East Coast, regarding the proposed sale of stock and lease to Tom Rob.

28. On January 10, 1987, Pinto, Sr. sent a second letter to the Defendant regarding the proposed sale to Tom Rob.

29. On January 12, 1987, Goldberg wrote to the Defendant indicating the continuing interest of Tom Rob in purchasing the East Coast stock and lease. Goldberg also provided financial statements of the directors of Tom Rob.

30. The Defendant's Board met on January 13, 1987, and considered the proposed transfer of East Coast's stock and lease to Tom Rob. The Board took no action on the request. The reasons for the Board's inaction, as reflected in the minutes of that meeting, were as follows:

(a) Pinto, Sr. had no authority to transfer the lease or stock due to the appointment of the receiver; and

(b) The receiver had no interest in the stock or lease because the Defendant had exercised its option to purchase the stock.

31. After the January Board meeting, both Goldberg and Dubroff requested a meeting with the Defendant's representative to discuss the proposed sale to Tom Rob. These requests were refused.

32. On January 14, 1987, the Defendant tendered a check in the amount of $8,400.00 as "full payment" of the option price for East Coast's twenty (20) shares as computed in accordance with the procedures set forth in the Stock Agreement. This payment was refused by Mattleman.

33. In or about mid–1987,[2] the Defendant issued twenty (20) new shares of stock which, together with a lease for unit 110, were offered for sale only to the Stockholders. One bid was received and accepted from Seidman–Goldblatt Produce Company (hereinafter referred to as "Seidman") in the amount of $75,000.00.

2. It is unclear from the record when the new stock was issued although it does appear that the new tenant took possession on July 1, 1987.

34. Tom Rob subsequently purchased the stock and lease of DiGiacomo Co.'s double units from Sussman for $310,000.00, which transfer was approved by the Board.

35. The Defendant would not now lease to the Debtors.

36. Both the Lease and the Stock Agreement provide that in the event of default by the lessee, the Defendant shall have the option to purchase the lessee's stock. However, paragraph nine (9) of the Stock Agreement further provides that the Defendant's option was however,

> subject, to the right of the ... [lessee] to sell or transfer the said shares of common capital stock within sixty (60) days after the termination of his lease to a third party in accordance with the provision of paragraph 1 of this agreement [relating to Board approval] provided that the [lessee].... is not indebted to the ... [Defendant] for any reason whatsoever.

37. The Defendant has stipulated in its Answer that the Debtors are not indebted to it by reason of defaults in the parties' lease agreement.

38. When East Coast ceased operations in August, 1986, the Company was unable to pay its regular recurring debts. At that time East Coast had debts in excess of $100,000.00. In November, 1986, East Coast's assets included the lease for unit 110, the twenty (20) shares of Defendant's Stock, the three (3) trailers attached to unit 110, and certain accounts receivable. Farber testified that the trailers were worthless.

39. Marvin J. Levin testified that East Coast had no assets from which the Receiver could continue to pay rent for unit 110 after November, 1986. Levin testified that East Coast's accounts receivable proved impossible to collect and that he could not locate any bank accounts for East Coast to attach.

40. East Coast was insolvent and unable to conduct its business at all times subsequent to November, 1986.

41. No evidence was presented regarding the value of the assets or liabilities of the individual Debtors, or their ability to conduct a business, at any time.

## CONCLUSIONS OF LAW

1. An action may be maintained under 11 U.S.C. § 548 to recover property once held by the debtor that is not now property of the estate due to a pre-petition fraudulent transfer.

2. The October 29, 1986, order from the state Court of Common Pleas did not invalidate the transfer from Pinto, Jr. to Pinto, Sr.

3. The Defendant lacks standing to challenge the validity of the transfer from Pinto, Jr. to Pinto, Sr.

4. The validity of the transfer from Pinto, Jr. to Pinto, Sr. is not a defense in an action to set aside a subsequent fraudulent transfer of the property.

5. The Debtors have standing to maintain action under 11 U.S.C. § 548 despite the pre-petition appointment of a receiver of East Coast.

6. The Defendant's actions of terminating the lease of Pinto, Sr. and exercising its option to purchase Pinto, Sr.'s twenty (20) shares of stock constituted a transfer of an interest of the Debtors in property under § 548(a).

7. This transfer has not, however, been established to be fraudulent transfer § 548(a)(1), since the Debtors had no intent to hinder, delay, or defraud their creditors in connection with such transfer.

8. The transfer of the Debtors' stock and leasehold interest in unit 110 was for less than reasonably equivalent value under § 548(a)(2)(A).

9. The Debtors have failed to establish *their* insolvency, as opposed to that of East Coast, pursuant to § 548(a)(2)(B)(i), at any pertinent time.

10. The Debtors have failed to establish that the transfers caused *them*, as opposed to East Coast, to have remaining an unreasonably small capital with which to engage in business, pursuant to § 548(a)(2)(B)(ii), at any pertinent time.

11. The Debtors having failed to establish all of the requisite elements to prove a fraudulent transfer of their lease and stock by a preponderance of the evidence, judgment must be entered for the Defendant.

DISCUSSION

## I. THE DEBTORS MAY MAINTAIN ACTION SEEKING AVOIDANCE OF A PRE–PETITION TRANSFER OF EAST COAST'S INTEREST IN ITS LEASE WITH THE DEFENDANT AND ITS STOCK IN THE DEFENDANT–CORPORATION

The Debtors seek to avoid the termination of the lease for unit 110 and the "transfer" of the Defendant's stock pursuant to 11 U.S.C. § 548. This Code section, relating to avoidance of "fraudulent transfers" provides, in relevant part, as follows:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

Before determining the applicability of the above-cited language to the present facts, we shall address a number of preliminary issues raised by the parties.

First, the Defendant argues that there can be no fraudulent transfer with respect to the lease since same was properly terminated pre-petition and, as a result, was not property of the Debtors' estate. The short answer to Defendant's argument is that a fraudulent transfer under § 548 requires, by definition, a pre-petition transfer of the debtor's interest in the property transferred. If a debtor's interest in property is transferred pre-petition, it may well be excluded from property of the estate. 11 U.S.C. §§ 541(a) and (b)(2); and *In re Norwood Aviation, Inc.*, 47 B.R. 155, 158 (Bankr.D.Mass.1985), *aff'd*, 63 B.R. 68 (D.Mass.1986). However, if the statutory conditions of § 548 are met, the pre-petition transfer may be avoided and the property so transferred or the value of such property, may be recovered for the benefit of the estate. 11 U.S.C. § 550(a)(1); and *In re Corbett*, 80 B.R. 32, 38 (Bankr.E.D.Pa. 1987) (transfer of debtor's home at sheriff's sale set aside as fraudulent transfer under §§ 548(a)(2)(A) and (B)(i)).

*In re Pietri*, 59 B.R. 68 (M.D.La.1986), cited by the Defendant, does not stand for the proposition that property must be included in property of the estate under § 541 to be the subject of an action to set aside a fraudulent transfer under § 548(a). In that case, the debtor, living in a community property state, entered into a marital property agreement whereby he and his spouse agreed to maintain their property separately. The *Pietri* court concluded that recordation of the agreement did not deprive the debtor of any property interest which he presently possessed. Rather, the agreement prevented the debtor from acquiring any future property rights due to operation of state community property laws. Since the agreement did not divest the debtor of any existing property interests, there was no "transfer" under § 548(a). *Id.* at 71.[3] In contrast, Pinto, Sr. clearly had an interest in the leasehold at unit 110 and in the twenty (20) shares of stock which he held prior to the November 11, 1986, correspondence terminating his

---

**3.** Additional cases cited by the Defendant are inapposite since they do not involve the right of a tenant/debtor to avoid a lease termination under § 548(a). *In re Northeastern Inter. Air-*

lease and advising him that the Defendant was exercising its option to purchase his stock.

■ The Defendant further argues that the transfer of East Coast from Pinto, Jr. to Pinto, Sr. was a fraudulent transfer. However, contrary to the assertions of the Defendant, this issue was not decided by the Court of Common Pleas. A default judgment was entered upon Battaglia's Complaint and the allegations of that Complaint were never actually litigated. The Order of October 29, 1986, does not, by its terms, invalidate the transfer from Pinto, Jr. to Pinto, Sr. Rather, the Order requires Pinto, Sr. to convey the business and its assets to a receiver appointed for East Coast,[4] presumably under the provisions of the Pennsylvania Uniform Fraudulent Conveyance Act (hereinafter referred to as "UFCA"), 39 P.S. § 351, *et seq.* No collateral estoppel affect will be accorded to the state court order since the allegations regarding fraudulent transfer were neither litigated nor decided. *In re McMillan,* 579 F.2d 289, 293 (3d Cir.1978) (default judgment has no collateral estoppel effect in nondischargeability case). *Cf. In re Somerville,* 73 B.R. 826, 837 (Bankr.E.D.Pa. 1987) (collateral estoppel only applies where an issue is actually litigated and determined by a valid final judgment).

■ Moreover, the validity of the transfer between Pinto, Jr. and Pinto, Sr. is not relevant to the present action. Even if

it were, the Defendant lacks standing to challenge the validity of such transfer under the UFCA since it was not a creditor of Pinto, Jr. 39 P.S. §§ 359, 360.[5] Only a *creditor* of Pinto, Jr. may seek invalidation of the transfer from Pinto, Jr. to Pinto, Sr. The Defendant should not be permitted to retain property fraudulently transferred to it by alleging that its transferor had obtained the property fraudulently.

■ Nor does the appointment of a receiver deprive the Debtors of standing to maintain the present action. Any property held by a state court receiver is required to be delivered to the bankruptcy trustee pursuant to 11 U.S.C. § 543(b)(1).[6] *In re Cash Currency Exchange, Inc.,* 762 F.2d 542, 552–554 (7th Cir.1985), *cert. denied sub nom. Fryzel v. Cash Currency Exchange, Inc.,* 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985). A bankruptcy trustee is authorized to avoid a fraudulent transfer under 11 U.S.C. § 549(a) and a Chapter 11 debtor in possession has rights of and can perform the duties of a bankruptcy trustee per 11 U.S.C. § 1107(a).[7]

## II. THERE WAS AN INVOLUNTARY TRANSFER OF DEBTORS' INTEREST IN THE LEASEHOLD AT UNIT 110 AND TWENTY (20) SHARES OF DEFENDANT'S STOCK FOR THE PURPOSES OF 11 U.S.C. § 548(a)

■ To establish a fraudulent transfer under § 548(a), there must have been a

ways, Inc., 56 B.R. 247 (S.D.Fla.1986) (month-to-month tenancy which is properly terminated post-petition is not property of the estate subject to automatic stay); *Norwood Aviation, supra* (landlord who properly terminates lease pre-petition is entitled to relief from the automatic stay); *In re Bricker,* 43 B.R. 344 (Bankr.D.Ariz.) (court refuses to resurrect a lease terminated pre-petition under either § 365 or the court's equitable powers). *But see In re Jones,* Bankr. No. 87–01409F, slip op. at 4 (Bankr.E.D.Pa. Oct. 22, 1987) (debtor may defend a motion for relief from stay on basis that a transfer can and would be avoided under § 548(a)).

4. Presumably if the transfer between Pinto, Jr. and Pinto, Sr. had been set aside, the receiver would have been appointed for Pinto, Jr. and/or his business, as well as for East Coast.

5. Moreover, the Defendant should be estopped from challenging the transfer between Pinto, Jr.

and Pinto, Sr. since Defendant had previously approved the transfer.

6. The legislative history of § 543(a) provides that:

This section requires a custodian appointed before the bankruptcy case to deliver to the trustee and to account for property that has come into his possession, custody, or control as a custodian. "Property of the debtor" in section (a) includes property that was property of the debtor at the time the custodian took the property, but the title to which passed to the custodian.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 370 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 84 (1978), U.S.Code Cong. & Admin.News, pp. 5787, 5870, 6326.

7. The present Adversary was commenced and tried before this matter was converted to Chapter 7.

transfer of an interest of the debtor in property. A transfer is broadly defined by the Code as follows:

> (50) "transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption;

11 U.S.C. § 101(50).[8]

In the context of § 548, the term "transfer" has been interpreted to include a spousal separation agreement, *Gray v. Snyder*, 704 F.2d 709 (4th Cir.1983); a default divorce decree granting the non-debtor spouse title to homestead property, *In re Clauser*, 44 B.R. 41 (Bankr.D.Minn.1984); a stock transfer agreement, *In re Edward M. Johnson & Associates, Inc.*, 61 B.R. 801 (Bankr.E.D.Tenn.1986); a consignment of goods, *In re Factory Tire Distributors, Inc.*, 64 B.R. 335 (Bankr.W.D.Pa.1986); and an agreement restricting a mortgage and increasing the amount of the principal debt, *In re Venice Western Motel Ltd.*, 67 B.R. 777 (Bankr.M.D.Fla.1986). *Cf. In re Wey*, 78 B.R. 892 (C.D.Ill.1987) (forfeiture of downpayment per contract to purchase hotel was a transfer under § 548(a) but was not fraudulent since debtor received reasonably equivalent value due to release from contractual duty to purchase hotel). In more analogous factual settings, the provisions of § 548(a) have been applied to termination of a lease by reason of breach of a covenant contained in the lease, *In re Ferris*, 415 F.Supp. 33 (W.D.Okla.1976); and *In re Queen City Grain*, 51 B.R. 722 (Bankr.S.D.Ohio 1985); to an agreement granting lessors an option to terminate the debtors' lease upon thirty (30) days notice, *In re Fashion World Inc.*, 44 B.R. 754 (Bankr.D.Mass.1984); and to a Settlement Agreement whereby the debtor relinquished its leasehold, *In re Edward Harvey Co.*, 68 B.R. 851 (Bankr.D.Mass.1987). Section 548(a) has also been applied to invalidate a public sale on foreclosure of a deed of trust in *Durrett v. Washington National Ins. Co.*, 621 F.2d 201 (5th Cir. 1980), as well as judicial foreclosure sales. *In re Hulm*, 738 F.2d 323 (8th Cir.), *cert. denied sub nom. First Federal Savings & Loan Ass'n. v. Hulm*, 469 U.S. 990, 105 S.Ct. 398, 83 L.Ed.2d 331 (1984); *In re Cole*, 81 B.R. 326 (Bankr.E.D.Pa.1988); and *Corbett, supra. Compare Madrid*, cited at 20 n. 8, *supra*.

Also instructive in this regard is the decision of the Third Circuit Court of Appeals in *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.), *cert denied sub nom. McClellan Realty Corp. v. United States*, ── U.S. ──, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). The court there affirmed a district court decision invalidating mortgages executed in connection with a complex leveraged buy-out of a corporation under the UFCA.[9] In so doing, the Court concluded that the Act's broad definition of conveyances "does not justify exclusion of a particular transaction such as a leveraged buy-out simply because it is innovative or complicated." *Id.* at 1297. The Court of Appeals, in *Tabor Court*, upheld the district court's conclusion that two separate loans made in connection with the transaction were but components of a single integrated transaction where the funds borrowed merely passed through the initial borrower to the ultimate recipient.

Given the broad definition of the term "transfer" under the Code, as amended, as well as the extensive application of § 548(a) to a variety of transactions, we have no doubt that there was a "transfer" of Pinto, Sr.'s interest in both the leasehold and the stock. Such transfer was effectuated when the Defendant sent its letter of November 11, 1986, which both terminated

---

8. 11 U.S.C. § 101(50) was amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353 to expressly include a foreclosure sale of a debtor's equity of redemption, thereby expressly overruling decisions following *In re Madrid*, 725 F.2d 1197, 1202–03 (9th Cir.1984).

9. The UFCA applies to "conveyances" which are defined as "... every payment of money, assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property, and also the creation of any lien or incumbrance." 39 P.S. § 351.

Pinto, Sr.'s lease and exercised Defendant's option to purchase Pinto, Sr., stock. Prior to that letter, Pinto, Sr. had an interest in a store lease which extended until June, 1988, and which was renewable thereafter. Also, prior to that time, Pinto, Sr. held twenty (20) shares of the Defendant's stock with a value greatly in excess of the $8,400.00 offered for it by the Defendant.

The Defendant argues that there was no transfer of Pinto, Sr.'s stock since the twenty (20) shares were never physically returned to the Defendant. The Defendant argues that there was no transfer with respect to the lease because (1) it was properly terminated, and (2) the lease was not transferred by or from the Debtor because the receiver had been appointed prior to termination of the lease.

■ In our view, the Defendant here is seeking to irrationally break down the present transaction into minute detail to support its contention that no transfer occurred. Such an approach is unwise and would unduly impede trustees in their efforts to utilize § 548(a) to recover property of the debtor which had been fraudulently conveyed pre-petition. The present transaction cannot avoid application of § 548(a) simply because it is novel and involves more players than the transferor and the ultimate transferee. *Tabor Court, supra,* 803 F.2d at 1297. Neither is this transaction exempt from § 548(a) due to the involuntary nature of this transaction. *Cf. Ferris, supra; Cole, supra; and Corbett, supra.*

■ The value of Defendant's stock is inextricably tied to the value of the lease of a unit at the terminal. It is clear from the testimony that the major, if not the only, reason that any person would pay anything for the Defendant's stock is to obtain a lease of a unit at the terminal. The stock appears to have no value to its owner apart from this benefit. In light of this fact, we must consider the termination of Pinto, Sr.'s lease together with Defendant's exercise of its option to repurchase Pinto, Sr.'s

stock in determining whether a transfer occurred and if reasonably equivalent value was given in exchange for such transfer.

Despite the fact that Pinto, Sr. or the receiver may have retained physical possession of Defendant's stock certificates, the Defendant's actions have deprived Pinto, Sr. of most, if not all, of the value of such stock. The Defendant offered to pay Pinto, Sr. $8,400.00 for the twenty (20) shares of stock which he had purchased from Pinto, Jr. for $150,000.00. It is clear that these shares would have no value if offered to any third person since they are not accompanied by the normal benefits of ownership, i.e., the right to lease a unit at the terminal. When the Defendant issued new certificates to be sold to Seidman, *this* was the Defendant's actual effectuation of its normal procedure to transfer its stock. These new certificates were clearly issued to accompany the new lease for unit 110.

■ Section 548(a) can be applied to recover property despite the appointment of a receiver since Section 548(a) by its terms applies to "any transfer of an interest of the debtor." The statute does not require that the transfer be either by [10] or from the debtor. We believe that a debtor retains a sufficient interest in property held by a state court receiver to invoke § 548(a) in order to avoid the fraudulent transfer of such property. A contrary interpretation would shield fraudulent conveyances by the appointment of a receiver. The Defendant cites no authority to support such an interpretation of § 548(a).

■ The Defendant argues that Pinto, Sr.'s lease was validly terminated and that a legal termination of the lease is not a fraudulent transfer. Debtors counter by arguing that the lease termination was invalid under state law. Both arguments seem to miss the point of § 548. Whether the transfer of the Debtor's interest in property was legal or not is irrelevant for the purposes of § 548. Any *otherwise legal* transfer may be avoided under § 548 if

**10.** Indeed, in an involuntary transfer situation, the transfer is generally effectuated "by" someone else. *Ferris, supra; Queens City Grain, su-*

*pra; Durrett, supra; Huber, supra; Cole, supra; and Corbett, supra.*

the requirements of that section are otherwise met, e.g., if the transfer was for less than reasonably equivalent value and rendered the debtor insolvent under §§ 548(a)(2)(A)–(B)(i). There was no suggestion in either *Cole* or *Corbett* that the sheriff's sales held in those cases were held illegally. Nevertheless, we invalidated those sales due to the fact that the debtors there were insolvent and received less than reasonably equivalent value for their residences at such sheriff's sales. Similarly, the legality of the termination of Pinto, Sr.'s lease and/or the Defendant's exercise of its option to purchase Pinto, Sr.'s stock will not preclude the avoidance of such transfers of the Debtors' property under § 548(a).

In fact, it appears in the present case that Defendant may have improperly exercised its option to re-purchase Pinto, Sr.'s stock under the Stock Agreement. Paragraph nine of the Stock Agreement provides that if a Stockholder's lease is terminated, then the Defendant shall have the option to purchase the Stockholder's shares at an amount calculated according to a formula set forth in the Agreement.[11] However, paragraph nine further provides that such a shareholder shall have sixty (60) days after the termination of his lease to sell or transfer his stock to a third party. Pinto, Sr. had a potential purchaser for his stock. However, the Defendant refused to approve a lease with or sale of stock to Tom Rob after the November, 1986, letter advising Pinto, Sr. that it was exercising its option to purchase Pinto, Sr.'s stock. Thus, Pinto, Sr. was effectively deprived of an opportunity to transfer his stock to a third party.

The Defendant's citation to Judge King's decision in *In re H. Fair and Son, Inc., Philadelphia Fresh Food Terminal Corporation v. Giordano*, Bankr. No. 76–2127WK (Bankr.E.D.Pa. Aug. 17, 1977),

*aff'd*, C.A. No. 76–2127 (E.D.Pa. Feb. 13, 1978), is inapposite. In that case, it appears that the Defendant here had initiated an adversary proceeding against the receiver appointed on behalf of the debtor seeking enforcement of its option to repurchase stock under a Stock Agreement.[12] The Bankruptcy Court upheld the Agreement indicating that it would not "rewrite an agreement in the absence of fraud, accident or mistake." *Id.*, slip op. at 2. However, the debtor in *Fair* was not seeking to avoid the termination of its lease or the Defendant's exercise of its option to repurchase the debtor's stock as a fraudulent transfer under § 548(a).

Thus, we conclude that the termination of Pinto, Sr.'s lease and the Defendant's exercise of its option to repurchase Pinto, Sr.'s stock affected a transfer of an interest of the Debtors under the terms of § 548(a).

### III. THE DEBTORS' INTENT TO HINDER, DELAY, OR DEFRAUD UNDER § 548(a)(1) HAS NOT BEEN PROVEN

The Debtors argue that Pinto, Sr.'s interest in the lease of unit 110 and his interest in Defendant's stock was transferred with intent to hinder, delay, or defraud the Debtors' creditors and can be avoided under § 548(a)(1). In support of this argument, the Debtors argue that a number of aspects of the present transaction constitute "badges of fraud" which establish intent to hinder, delay or defraud under § 548(a). *See In re Stelle*, 79 B.R. 503, 504 (Bankr.M.D.Fla.1987) (setting forth several facts and circumstances which are considered indicia of fraud). *See also* 37 AM. JUR.2d 708–10 (1968).

However, under the plain language of § 548(a)(1), it is the *debtor/transferor's* intent that is relevant and not that of the

---

**11.** Paragraph five (5) provides the Defendant with an option to re-purchase stock in the event that a stockholder is adjudicated bankrupt or insolvent or files a petition in bankruptcy. It does not appear that this provision is applicable to the present facts since the Defendant notified Pinto, Sr. that it was exercising its option in November, 1986, prior to any bankruptcy pro-

ceeding. Paragraph five (5) does not appear to grant Defendant an option to re-purchase upon appointment of a receiver.

**12.** It has not been established that the Stock Agreement in *Fair* was the same as the Stock Agreement in issue in the present case.

*transferee. See In re Metro Shippers, Inc.*, 78 B.R. 747, 752 (Bankr.E.D.Pa.1987). Only when a transferee is in a position to dominate or control the debtor's disposition of the property may the transferee's intent to hinder, delay, or defraud may be imputed to the debtor/transferor. 4 COLLIER ON BANKRUPTCY, ¶ 548.02, at 548–34 (15th ed. 1988). However, this rule is generally limited to situations where the transferee is an officer or insider or a parent company of the transferor. *See Duberstein v. Werner*, 256 F.Supp. 515, 520 (E.D.N.Y.1966) (desire of dominant stockholder to obtain advantage over other creditors satisfies intent requirement of § 548(a)(1); *In re Vaniman International, Inc.*, 22 B.R. 166, 182–85 (E.D.N.Y.1982) (fraudulent intent on part of two officers/majority stockholders imputed to debtor); *Langan v. First Trust–Deposit Co.*, 293 N.Y. 604, 59 N.E.2d 424 (1949) (intent imputed where transferee bank had taken over management of the bankrupt's affairs). The Defendant here did not control or dominate the affairs of the Debtors. As a result, we will not impute any fraudulent intent on the part of the Defendant to the Debtors for the purpose of satisfying the intent requirement of § 548(a)(1).

## IV. THE DEFENDANT TERMINATED PINTO, SR.'S LEASE AND EXERCISED THE OPTION TO REPURCHASE ITS STOCK FOR LESS THAN A REASONABLY EQUIVALENT VALUE

▮ In an action based on § 548(a)(2), the party seeking to avoid the transfer has the burden of establishing that the transfer was made for less than reasonably equivalent value. *In re Brunell*, 47 B.R. 830 (Bankr.E.D.Pa.), *aff'd*, 76 B.R. 64 (E.D.Pa. 1985). Nevertheless, we have no difficulty here finding that the Debtors received less than a reasonably equivalent value for the transfer of their interest in the leasehold of unit 110 and in the twenty (20) shares of Defendant's stock.

The determination of whether the termination of a lease is a transfer for reasonably equivalent value or not depends on whether a good bargain is being given up or a burdensome obligation is being discharged. *Ferris, supra*, 415 F.Supp. at 40–41; 4 COLLIER, *supra*, ¶ 548.09 at 548–109. Whether reasonably equivalent value was given will depend on the facts of each case.

In *Ferris*, the Court compared the equity of the tenants' improvements plus the difference in monthly rental payments under the terminated lease and the monthly rent paid by a replacement tenant to the landlord's claim to $6,000.00 in back rent. *Id.* at 40–41. The *Ferris* Court concluded that the debtor's lease was a good bargain and not a burdensome obligation, and hence that a termination of the lease could be avoided as a fraudulent transfer. *Id.* at 41. In *Fashion World, supra*, the debtor presented expert testimony that the debtor's lease was substantially below market rates to establish that the debtor had not received reasonably equivalent value in exchange for an agreement granting the lessor an option to terminate the lease. 44 B.R. at 756. As a result, the court found that the agreement was avoidable as a fraudulent transfer. *Id.* at 759. And, in *Edward Harvey, supra*, 68 B.R. at 858–59. The court found that the landlord had found that the landlord had obtained the right to relet the premises for a substantially higher rent, and concluded that a lease termination agreement could be avoided as a fraudulent transfer.

In the present case, no expert testimony was presented regarding the value of Pinto, Sr.'s leasehold interest. Nor do we know the amount of monthly rent presently being paid for unit 110. However, in the present case, the leasehold interest has a value separate from the amount of monthly rent paid, *i.e.*, the value of the twenty (20) shares of the Defendant's stock. It is clear that the amounts paid for the Defendant's stock were paid for the privilege of leasing units at the terminal. The Defendant's stock has no value independent of this privilege. Thus, the value of the Defendant's stock when accompanied by the ability to lease a unit must be considered in determining the value of the interest that Pinto, Sr. lost in the transfer.

In 1982, Pinto, Jr. and Sussman paid $250,000.00 for forty (40) shares of the Defendant's stock. In 1985, Pinto, Jr. purchased twenty (20) shares of the Defendant's stock for $150,000.00, which he subsequently sold to Pinto, Sr. for $150,000.00. Pinto, Jr. purchased and sold an additional twenty (20) shares for $150,000.00. Tom Rob was willing to pay at least $75,000.00 to $100,000.00 for Pinto, Sr.'s twenty (20) shares of stock. Tom Rob subsequently paid $310,000.00 for forty (40) shares of stock. The Defendant sold the twenty (20) new shares of stock in a very limited offering setting for $75,000.00.

We find that, by terminating Pinto, Sr.'s lease and exercising its option to repurchase its stock, the Defendant deprived Pinto, Sr. of an interest in the leasehold and stock worth between $75,000.00 to $150,000.00. The value lost by Pinto, Sr. in this transaction is greatly in excess of the $8,400.00 offered by the Defendant to repurchase its twenty (20) shares of stock. Pinto, Sr. clearly lost a good bargain as a result of the contested "transfer." The facts in the present case are more striking than such cases as *Corbett, supra,* in which we held that debtors who realized approximately sixty-two (62%) percent of the fair market value of their home at sheriff's sale obtained less than "reasonably equivalent value" under § 548(a)(2)(A).

## V. THE DEBTORS HAVE FAILED TO ESTABLISH THEIR INSOLVENCY UNDER § 548(a)(2)(B)(i)

In order to avoid a transfer under §§ 548(a)(2) the party attacking the transfer must not only establish the receipt of less than adequate consideration by the debtor-transferor in the transaction, as required by § 548(a)(2)(A). In addition, it must be established that one of the alternatives set forth in § 548(a)(2)(B) are present. It is the latter requirement that we find that the Debtors here have failed to meet, despite the greater attention given by the Defendant to other issues.

To meet the requirement of § 548(a)(2)(B)(i), it must be shown that, in addition to receiving less than a reasonably equivalent value, the debtor was insolvent on the date of such transfer or became insolvent as a result of such transfer. *Metro Shippers, supra,* 78 B.R. at 753. *See Hulm, supra,* 738 F.2d at 325 (no dispute regarding debtor's insolvency); and *Cole, supra,* 81 B.R. at 327 (parties stipulate that debtor was insolvent at time of transfer). The Debtors have failed to establish their insolvency under this provision. Insolvency, under the Code, is defined, at 11 U.S.C. § 101(31), as follows:

> (A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
>
> > (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
> >
> > (ii) property that may be exempted from property of the estate under section 522 of this title;

*See Corbett, supra,* 80 B.R. at 37–38. (Debtors have established their insolvency where it is shown that liabilities exceed non-exempt assets).

The Debtors have presented some, but not a great deal of, evidence regarding the insolvency of East Coast. Pinto, Jr. testified that East Coast was unable to pay its obligations as they became due, thus prompting the appointment of a receiver in state court. Pinto, Sr. still owed Pinto, Jr. for most of the $150,000.00 purchase price for the twenty (20) shares of Defendant's stock. Levin established that the accounts receivable held by East Coast were uncollectible and, as a result, worthless and that it had no liquid assets. According to Farber, the trailers owned by East Coast were also worthless. The Debtors nevertheless never undertook to present a comprehensive picture of the assets and liabilities of East Coast.

More significantly, even if the Debtors had established the insolvency of East Coast, they have failed to establish the insolvency of the important parties, i.e., themselves. A "debtor" is defined by the Code as a person "concerning which a case

under this title has been commenced." 11 U.S.C. § 101(12). In this case, the Debtors are Mary Pinto and Joseph Pinto, Sr., individually and trading as East Coast. East Coast is not the Debtor in this case, assuming *arguendo* that it could be a debtor, as it appears from a reading of 11 U.S.C. §§ 109, 101(35), 101(8)(A)(iv) in combination.[13] Absolutely no evidence was presented regarding the individual assets and liabilities of the Debtors.[14] Absent proof of insolvency, the transfer may not be avoided as a fraudulent transfer under §§ 548(a)(2)(A)–(B)(i).

VI. THE DEBTORS HAVE FAILED TO ESTABLISH THAT THEY WERE ENGAGED IN A BUSINESS OR TRANSACTION FOR WHICH THEY HAD UNREASONABLY SMALL CAPITAL

In order to avoid a transfer under the provisions of §§ 548(a)(2)(A)–(B)(ii), it must be shown that the debtor was engaged or was about to engage in a "business or a transaction" and that the transfer left the debtor with unreasonably small capital for continuance of the business. It is sufficient for the purposes of §§ 548(a)(2)(A)–(B)(ii) that the debtor merely contemplates "continuance of an enterprise or venture on its previous scale." 4 COLLIER, *supra,* ¶ 548.04 at 548–55.

It is clear that East Coast had ceased doing business prior to Defendant's termination of its lease and exercise of its option. While the Defendant's actions in so doing may be considered a "transaction," it was not one undertaken by the Debtor.

Application of §§ 548(a)(2)(A)–(B)(ii) is generally limited to businesses that are continuing operations on some scale. *Wells Fargo Bank v. Desert View Bldg. Supplies,* 475 F.Supp. 693 (D.Nev.1978), *aff'd,* 633 F.2d 225 (9th Cir.1980) (Desert

View continued in the building supply business after alleged fraudulent transfer). *Cf. Fidelity Trust Co. v. Union Nat'l Bank,* 313 Pa. 467, 169 A. 209 (1933), *cert. denied,* 291 U.S. 680, 54 S.Ct. 530, 78 L.Ed. 1068 (1934) (debtor engaged in business of buying and selling securities at time of alleged fraudulent transfer). Such application of §§ 548(a)(2)(A)–(B)(ii) is consistent with the primary intent of this statute, which is "to prevent an undercapitalized company from being thrust into the market place to attract unwary creditors to inevitable loss." *Wells Fargo, supra,* 475 F.Supp. at 696.

The trustee bears the burden of establishing all of the elements which render a transfer fraudulent under § 548, including that the debtor was left with unreasonably small capital. 4 COLLIER, *supra,* ¶ 548.04, at 548–55. *Cf. Metro Shippers, supra,* 78 B.R. at 750; and *In re Owen J. Rogal, D.D.S., Ltd.,* 38 B.R. 677, 679 (Bankr.E.D.Pa.1984). Even assuming that the Debtors were engaged in a "business or transaction," they have failed to establish that such a business was undercapitalized.

Where a debtor is engaged in business, a finding of insolvency also establishes that the debtor was left with unreasonably small capital. *United States v. Gleneagles Inv. Co.,* 565 F.Supp. 556 (M.D.Pa.1983), *aff'd sub nom. United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir.) *cert. denied sub nom. McClellan Realty Co. v. United States,* —— U.S. ——, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); and *In re Purco,* 76 B.R. 523, 529 (Bankr.W.D.Pa. 1987). Similarly, where the debtor's proof fails to establish insolvency, it will likewise fail to establish that the debtor was left under-capitalized as a result of an alleged fraudulent transfer. The Debtors here submit no more or better proof of their

---

**13.** A "debtor" must be a "person." A "person" includes only an "individual," a "partnership," or a "corporation." However, a "corporation" includes an "unincorporated company or association."

**14.** As we noted in *Corbett,* we cannot consider the Debtors' Chapter 13 Statement lists to determine the Debtors' insolvency when same are not

properly admitted into evidence before us. *Corbett, supra,* 80 B.R. at 35 n. 3. *See In re Aughenbaugh,* 125 F.2d 887, 89 (3d Cir.1942); and *In re Nicolet, Inc.,* 80 B.R. 733, 742–44 (Bankr.E.D.Pa. 1987) (Debtor must at least offer portions of case file into evidence to have them considered in deciding a particular contested matter).

under-capitalization than they did of their insolvency. As a result, it is impossible for us to determine, on the basis of the present record, that the transfer of Pinto, Sr.'s interest in the Defendant's stock and the lease of unit 110 left the Debtors, as opposed to East Coast, with unreasonably small capital to remain in business. *Compare Kupetz v. Continental Illinois National Bank & Trust Co.*, 77 B.R. 754 (C.D.Cal.1987) (plaintiff failed to sustain burden of proving that transfer left company with unreasonably small capital despite expert testimony and detailed evidence regarding the value of the business and assets); and *In re Colombian Coffee Co., Inc.*, 62 B.R. 542 (Bankr.S.D.Fla.1986) (Trustee failed to establish under-capitalization despite testimony of independent certified public accountant).[15]

## VII. CONCLUSION

The Defendant's actions in terminating Pinto, Sr.'s lease and exercising its option to repurchase Pinto, Sr.'s share of stock effected a transfer of an interest held by Pinto, Sr. for less than a reasonably equivalent value. However, this transfer cannot be avoided under 11 U.S.C. § 548(a)(2) because the Debtors have failed to prove either *their* insolvency or that *they* were left with an unreasonably small amount of capital subsequent to such transfer. The Debtors also failed to prove that *they* lacked the requisite intent to defraud in order to avoid the transfer under § 548(a)(1). This result is somewhat regretful, because the Debtors may well have been able to prove the elements of §§ 548(a)(2)(B)(i) or (a)(2)(B)(ii) if they had carefully assessed their case. They may, of course, attempt to reopen the record to present such evidence. *But see*, 6 A.J. MOORE, ¶ 591.04[13], at 59–36 to 59–37 (2d ed. 1988) (court views such a motion after a decision is rendered with disfavor).

The Debtors suggest in their post-trial submission that the Defendant's actions in this matter were unconscionable and that the Defendant should not be allowed to be unjustly enriched as a result of its actions. The evidence presented in the present matter may have supported a claim of unjust enrichment. *See Schott v. Westinghouse Electric Corp.*, 436 Pa. 279, 290, 259 A.2d 443, 449 (1969).[16] However, the Debtors did not plead a cause upon unjust enrichment in their Complaint. Nor did they directly address this issue in their Trial Memorandum. The Debtors could have sought to amend their pleadings, either to conform to the evidence presented at trial pursuant to B.Rule 7015 and Federal Rule of Civil Procedure (hereinafter "F.R.Civ.P.") 15(b), or otherwise pursuant to B.Rule 7015 and F.R.Civ.P. 15(a). However, we cannot amend the Debtors' pleading *sua sponte*. If the Debtors wish to present a claim based on unjust enrichment, they would be required to file a Motion to amend their original pleadings and succeed in convincing us that such a motion at this juncture would not be untimely. *See* 3 J. MOORE, *supra*, ¶ 15.10, at 15–104 to 15–108. The Defendant must, in any event, be given an adequate opportunity to respond if any new additional, legal theory is introduced.

However, on the record of this proceeding at this juncture, we are compelled to enter judgment in favor of the Defendant.

---

**15.** It has neither been alleged, argued, nor proven that the Debtors intended to incur debts beyond their ability to pay such that would render the present transfer fraudulent under §§ 548(a)(2)(A)–(B)(iii).

**16.** To recover on the basis of unjust enrichment, it must be shown both that the defendant was enriched and that it would be unjust to deny restitution. *Efco Importers v. Halsobrunn*, 500 F.Supp. 152, 157 (E.D.Pa.1980).