**CARPENTERS HEALTH AND WELFARE FUND OF PHILADELPHIA AND VICINITY, et al.**

v.

**BUILDING TECH, INC., et al.**

Civ. A. No. 89–8493.

United States District Court, E.D. Pennsylvania.

Oct. 1, 1990.

---

Robert S. Goldstein, Philadelphia, Pa., for plaintiffs.

Marian A. Kornilowicz, Philadelphia, Pa., for defendants.

## DECISION AND ORDER

VAN ANTWERPEN, District Judge.

Plaintiffs, Carpenters Health and Welfare Fund of Philadelphia and Vicinity, Carpenters Pension and Annuity Fund of Philadelphia and Vicinity, Carpenters Joint Apprentice Committee, General Building Contractors Association Industry Advancement Program, Metropolitan District Council of Carpenters of Philadelphia and Vicinity, United Brotherhood of Carpenters and Joiners of America, Carpenters Political Action Committee of Philadelphia and Vicinity, Edward Coryell, and John Reith, (hereinafter "the Plaintiff Funds"), filed suit on November 28, 1989 against Building Tech, Inc., (hereinafter "BTI Corporation"), and individually against its owner, Harry

Forrest.[1] The Plaintiff Funds sought monetary payment of unpaid contributions, with interest and liquidated damages penalties under ERISA; payment of liquidated damages contractually assessed on late contributions paid before suit; and injunctive relief enjoining defendants to permit an audit of their records in order to determine the amount of unpaid contributions and to refrain from future violations of the collective bargaining agreement.

This court has jurisdiction in this matter pursuant to the Employee Retirement Income Security Act (hereinafter "ERISA") § 502(e), 29 U.S.C.A. § 1132(e) (West 1985) and the Labor Management Relations Act § 301(a), 29 U.S.C.A. § 185(a) (West 1978). From the non-jury trial held on September 12, 1990, in Easton, Pennsylvania, we make the following findings of fact.

## I. FINDINGS OF FACT

1. Plaintiff Funds collect medical, health-related, pension annuity, apprenticeship, and industry advancement plan fringe benefits from employers who are parties to collective bargaining agreements with the Metropolitan District Council of Carpenters of Philadelphia and Vicinity. The Plaintiff Funds maintain extensive records and employ a collections manager and an eight-member auditing staff.

2. BTI Corporation is a corporation whose business address is in Swarthmore, Pennsylvania. BTI Corporation employs persons who are covered by the Plaintiff Funds.

3. Defendant Harry Forrest is president of BTI Corporation.

4. On March 24, 1989, Harry Forrest signed and agreed to be legally bound by a master agreement (the 1989 Agreement) negotiated at arms length between the Metropolitan District Council of Carpenters and the General Building Contractors Association and the Concrete Contractors Association. The Agreement contained provisions relating to payment, collection, and

delinquency of employer contributions to the Plaintiff Funds.

5. The 1989 Agreement art. 16, sec. 1(a) contains the following provisions:

(a) Commencing on May 1st, 1988, each Employer shall, on or before the tenth day following the end of each payroll week, pay to Mellon Bank ... a sum as specified in clauses (i) or (ii) of this subsection (a) for each hour ... for which wages or any type of compensation payable (under this Agreement) are payable during such payroll week to any employee,....

. . . . .

The following procedures will be applicable in the event of delinquent payments as required in Articles 5, 16, 17, 18 and 21.

(1) Payments not received by the 10th day following the payroll week which the Report covers shall be considered delinquent.

(2) Payments made after the Due Date will be subject to liquidated damages of 10% of the gross amount due each fund.

(3) If not received by 10 days after the Due Date, the gross amount due each fund will be subject to the above 10% liquidated damages....

6. BTI Corporation has a persistent record of untimely payments and reports to the Plaintiff Funds.

7. This suit commenced when plaintiffs filed their complaint on November 28, 1989.

8. As of November 28, 1989, the following contributions were due and owing the Plaintiff Funds: (a) contributions for the weeks of October 1, October 8, October 15, October 22, and October 29, 1989, (b) contributions for the weeks of November 5, and November 12, 1989, and (c) $33.95 remaining on the contributions for June 1989. The Plaintiff Funds had found BTI Corporation's June 1989 contribution to be $254.57 short. In August 1989, BTI Corporation overpaid its contributions by $220.62, leaving $33.95 still outstanding.

---

**1.** All individual claims against Mr. Forrest were dismissed upon motion under Fed.R.Civ.P. 41(b).

9. The Plaintiff Funds received partial payment of the October 1989 contributions on December 19, 1989, and the remaining balance on May 7, 1990. The Plaintiff Funds received the November 1989 contributions on the same day.

10. As of November 28, 1989, BTI Corporation had not paid liquidated damages assessed pursuant to the 1989 Agreement for delinquently paid contributions from May, June, July, and August 1989.

11. The remaining contributions for November 1989, contributions for December 1989, and contributions for January, February, March, May, and June 1990 became delinquent after the Plaintiff Funds began this action, but were paid before trial. The Plaintiff Funds assessed BTI Corporation liquidated damages for these late payments as well as for the late payments of October 1989 and the first two weeks of November 1989.

12. On May 7, 1990, BTI Corporation paid to the Plaintiff Funds $29,494.70, the total amount of the delinquent contributions as of that date.

13. As of trial, the liquidated damages assessed pursuant to the 1989 Agreement, after crediting BTI Corporation the overage paid in August 1989, amounted to $6683.38.

## II.  DISCUSSION

### A.  *Background*

To understand the court's adjudication of this action, it is essential to review the conduct of this lawsuit from its inception through its trial.

### 1.  The Agreement

On March 24, 1989, Harry Forrest signed a Non–Association Employer's Acceptance of the 1989 Agreement on behalf of BTI Corporation agreeing to be bound by the provisions of the master agreement negotiated between two employer associations and the carpenters and joiners union. (Plaintiffs' Exh. 1 at 54.) The 1989 Agreement provided the procedure for employers to contribute to various Plaintiff Funds for the health and welfare of their employees. The 1989 Agreement obligated an employer to submit weekly remittance reports for covered employees listing the hours they worked and the amount of benefits the employer owed the Plaintiff Funds.[2] Without these reports, the Plaintiff Funds cannot determine how much is owed to them. The 1989 Agreement art. 16, sec. 1(a) called for the payment of weekly contributions within ten days after the end of the payroll week:

> (a) Commencing on May 1st, 1988, each Employer shall, *on or before the tenth day following the end of each payroll week,* pay to Mellon Bank ... a sum as specified in clauses (i) or (ii) of this subsection (a) for each hour ... for which wages or any type of compensation payable (under this Agreement) are payable during such payroll week to any employee....

Plaintiffs' Exh. 1 at 19–20 (emphasis added).

In the event of delinquency, the 1989 Agreement art. 16, sec. 1(a) also states that liquidated damages of 10% of the gross amount due would be levied against the breaching employer:

> The following procedures will be applicable in the event of delinquent payments as required in Articles 5, 16, 17, 18 and 21.
>
> (1) Payments not received *by the 10th day following the payroll week which the Report covers* shall be considered delinquent.
>
> (2) Payments made after the Due Date will be subject to liquidated damages of 10% of the gross amount due each fund.
>
> (3) If not received by 10 days after the Due Date, the gross amount due each fund will be subject to the above 10% liquidated damages....

Plaintiffs' Exh. 1 at 20–21 (emphasis added).

From April 1988 through April 1989, BTI Corporation continually paid its contributions to the Plaintiff Funds weeks, and in

---

**2.** 1989 Agreement art. 16, sec. 1(b) (Plaintiffs' Exh. 1 at 21–22).

many cases, months after they became due. BTI Corporation did not regularly submit the remittance reports by which the Plaintiff Funds could verify the amounts BTI Corporation contributed and the benefits to which its employees were entitled.

### 2. The Complaint

On November 28, 1989, Plaintiff Funds filed a six count complaint. In Count I, Plaintiff Funds alleged BTI Corporation had not paid contributions for June, July, and August 1989[3] as it was obligated to do under the 1989 Agreement. The Plaintiff Funds asked for judgment on these amounts "plus any additional amounts which are found to be due and owing during the pendency of this litigation." (Complaint at ¶ 19.) In Count II, the Plaintiff Funds claimed judgment for the unpaid contributions, interest, liquidated damages, and attorney's fees under ERISA. Count III complained of the Plaintiff Funds' inability to calculate the precise amounts due and owing because of BTI Corporation's failure to submit contractually-required remittance reports, and requested an order forcing BTI Corporation to comply with an audit. Counts IV and V asked for judgment respectively under the 1989 Agreement and under ERISA, for the unpaid contributions discovered after the audit. Finally, Count VI requested court ordered compliance with the terms and obligations of the 1989 Agreement.

### 3. Settlement Negotiations

From January through May 1990, the parties' counsel discussed BTI Corporation's delinquent submission of remittance reports and fund contributions and the terms upon which the matter could be resolved. The Plaintiff Funds insisted upon payment of liquidated damages and attorneys fees in addition to the late contributions while BTI Corporation was only willing to submit its reports and forward the late payments, which it finally did on May 7, 1990.

In an effort to promote settlement, defendant's counsel, Mr. Marian Kornilowicz, requested a conference with the court on May 29, 1990. Mr. Kornilowicz then informed plaintiffs' attorney, Mr. Richard McDonald, of the proposed conference. The court scheduled a conference, but shortly before the conference was to take place, Messrs. Kornilowicz and McDonald conferred on the telephone. They seemingly arrived at a settlement agreement, albeit each attorney subscribing to radically different versions of its terms. Each attorney represented to the court that the case had been settled, and the court canceled the conference.

On June 20, 1990, Mr. Kornilowicz received Mr. McDonald's draft of the settlement agreement, at which point it became obvious to both lawyers that they in fact had not agreed upon anything. Mr. McDonald then reported to the court that the case had not settled. He also informed the court that he did not wish to inconvenience Mr. Kornilowicz who had scheduled a five-week vacation beginning on June 22, and that counsel had agreed among themselves and requested the court to delay taking any action in this matter until August. The court acquiesced in this request. Cross motions for summary judgment[4] and defendant's motion to enforce the "settlement" agreement were duly filed in mid-August after Mr. Kornilowicz's return.

The week before Labor Day, Mr. Kornilowicz called the court's deputy clerk and inquired about the court's schedule as he was contemplating filing a request for a temporary restraining order (hereinafter "TRO") to prevent the plaintiffs from engaging in self-help. He also informed opposing counsel of his intentions. The deputy clerk informed him that the court would

---

**3.** The Complaint actually refers to June, July, and August of 1988, a typographical error which both parties privately acknowledged meant 1989. *See* Defendant's Motion to Enforce a Settlement Agreement, Exh. B, Letter of Marian Kornilowicz to Sanford Rosenthal (January 10, 1990). The court deemed the Complaint so amended at trial after defense counsel attempted to follow the Complaint literally. (Record at 31).

**4.** Both summary judgment motions were denied as being filed too close to trial.

make time available the following week in Easton. After the Labor Day Holiday, the court received plaintiffs' response to the motion to enforce the "settlement" agreement. Since neither counsel had requested a hearing during the period the court was available, the court, on its own initiative, called both counsel before the court to discuss the outstanding motions on Friday afternoon, September 7, 1990. With the permission of counsel, the court inquired into the terms of the alleged settlement and discovered that no workable agreement existed.

### 4. The TRO

With the hope of settlement gone, Mr. Kornilowicz moved for a TRO. The court indicated it was too late for further proceedings on that Friday evening and explained its legal duty to attend [5] the Third Circuit Judicial Conference in Wilmington, Delaware that Sunday, September 9, through Tuesday, September 11. In light of its obligation and in view of the five-week vacation counsel previously agreed to, the court asked both counsel if they would agree to maintain the status quo on Monday and Tuesday until a hearing could be held early Wednesday morning. Plaintiffs' counsel said he could not agree to this request by the court. He said that beginning on Tuesday, September 11, 1990, the United Brotherhood of Carpenters and Joiners would engage in self-help and withhold laborers from BTI Corporation's worksite until BTI Corporation paid the disputed liquidated damages and attorney's fees. BTI Corporation was the designated concrete subcontractor for a project at the Philadelphia Zoo and had allegedly been advised by its general contractor that unless it received assurances that the union would not so act, it would cancel BTI Corporation's $400,000 contract. At this point, the Plaintiff Funds' claim was only $6,000 plus fees and costs, and BTI Corporation

sought to enjoin the Plaintiff Funds from withholding the workforce. The Court then offered to conduct a hearing the next day at 9:00 a.m., Saturday morning, the day before the Third Circuit conference. Mr. Kornilowicz told the court he might not be able to get his client to Easton on such short notice. After hearing further argument from both attorneys, the court stated that it would reluctantly issue a TRO. The TRO required the posting of a $10,000 bond and was for the sole purpose of maintaining the status quo for two days. Neither counsel informed the court of the relevant law or made proper legal objections [6] to the court's action at that time. *See generally,* Transcript of TRO Hearing.

On Monday, after the court had gone to the conference, Mr. McDonald's colleague, Mr. Thomas Kohn, telephoned chambers demanding an immediate hearing before the court. The deputy clerk reminded him of the court's presence at the judicial conference whereupon Mr. Kohn sought access to the designated emergency judge for that week, the Honorable Norma S. Shapiro, who was also at the conference. After listening to Mr. Kohn's plea for an immediate hearing by telephone, Judge Shapiro agreed to return to Philadelphia and hear him Tuesday morning and to allow him to make a limited record. "At that point I was convinced that Mr. Kohn was simply judge-shopping and I intended to place that view on the record." [7] Mr. Kornilowicz, however, obviated Mr. Kohn's demand for a hearing by failing to post the required bond thereby effectively preventing the TRO from taking effect.

### 5. Trial on the Merits and Motion to Enforce Settlement

This court set aside all other business and convened early on Wednesday morning. The court vacated the TRO *ab initio* in view of the fact that the required bond

---

5. See Rule 18(1) of the Rules of the United States Court of Appeals of the Third Circuit.

6. Plaintiffs did belatedly telefax to chambers a brief memorandum in opposition to the TRO. Mr. McDonald, however, mentioned none of the

memorandum's arguments on the record before the court.

7. Memorandum of Judge Norma S. Shapiro to Judge Franklin S. Van Antwerpen (September 13, 1990).

was never posted. To avoid having counsel act as witnesses [8] until the case on the merits was over, the court told counsel to try the merits of the case before conducting a hearing on the motion to enforce the so-called settlement. Mr. Kornilowicz then said that he could not proceed because he had "assumed that the court would hear the motion to enforce first, and our witness [his client], Harry Forrest, will not be here until around noon." (Record at 3). The court proceeded to hear plaintiffs' case-in-chief on the merits, which consisted of the testimony of one witness, Mr. David G. Costello, Collections Manager of the Plaintiff Funds.

**8.** During Friday's conference discussion of when to schedule the hearing and the trial, the court learned that for purposes of the hearing on the motion to enforce the settlement agreement, both Mr. McDonald and Mr. Kornilowicz planned to call themselves as witnesses and to cross-examine each other. The court brought to the lawyers' attention the possible ethical problems of being both an advocate and a witness. They agreed not to disqualify each other, and the court chose not to disqualify them on its own initiative.

Local Rule of Civil Procedure Rule 14 provides, "The Rules of Professional Conduct adopted by this Court are the Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania." The Rules of Professional Conduct superseded Pennsylvania's Code of Professional Responsibility on April 1, 1988. Rule 3.7 states:

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9. Rules Prof. Conduct 3.7, 42 Pa.Cons.Stat.Ann. (Purdon's Supp.1990).

Since the attorneys were testifying favorably toward their own clients, there was no conflict of interest inherent in the content of their testimony. Each side had a lawyer-witness and neither gained an advantage or suffered a disadvantage on cross-examination. Since it was a non-jury trial, there was no risk of the fact-finder being unable to separate the lawyers' dual roles. Finally, both clients might have suffered

After plaintiffs had rested, in the interest of fairness to BTI Corporation, the court then convened a hearing on defendant's motion rather than forcing defense counsel to present his case on the merits without his witness. Mr. Kornilowicz took the stand, was sworn, and explained his perception of the alleged settlement agreement. He admitted under cross-examination that Plaintiffs' Exh. 21, his May 29, 1990 letter memorializing the terms of the settlement agreement, was susceptible to two interpretations.[9] (Record at 63–64). Mr. Kornilowicz then told the court he would conclude his presentation after calling opposing counsel, Mr. McDonald, as his own witness.[10] *Id.* at 66.

substantial hardship from disqualification of their attorneys.

**9.** Defendant based its motion to enforce a settlement agreement on the following language embodied in Plaintiffs' Exh. 21, the May 29, 1990 letter Mr. Kornilowicz sent to Mr. McDonald:

This letter serves to confirm the terms of the parties' settlement agreement, which are as follows:

1. upon the signing of the agreement, defendants will pay $500.00 toward plaintiffs' attorney's fees;

2. defendants shall be permitted to make monthly payments to the Fund;

3. if defendants fail to make timely monthly payment to the Fund during the next six (6) months, judgment will be entered for the full amount of the liquidated damages and the remainder of the attorney's fees which, at this time, total about $6,218.09 for liquidated damages and about $1,600.00 for attorney's fees. (You and I agreed to work out the precise meaning of timely, but we were both considering about a two (2) week period); and

4. if timely payments are made during the next six (6) months, no further attorney's fees or liquidated damage payments will be required of defendants.

**10.** Mr. McDonald testified that he believed he had agreed to let BTI Corporation pay $500.00 up front at the signing of a judgment note, with the remaining contractual liquidated damages and attorney's fees paid in installments over a six month period. If BTI Corporation's payments were untimely, the Plaintiff Funds would be entitled to enter judgment against BTI Corporation. "Timely" was defined as the fifteenth day of the month following the one in which payments were due.

Mr. Kornilowicz, on the other hand, represented to the court that he understood the terms as $500.00 towards the payment of liquidated

After Mr. McDonald finished testifying, the court inquired of Mr. Kornilowicz whether he had anything further to present. At this point, Mr. Kornilowicz now said that he wanted to examine Mr. Costello [11] and that Mr. Costello was no longer in the courthouse. Messrs. Kohn and McDonald had allowed Mr. Costello to leave without permission from the court after he had testified and been cross-examined by Mr. Kornilowicz in plaintiffs' case on the merits. The court recessed for two hours to allow time for lunch and for counsel to locate Mr. Costello.

When the court reconvened at 2:00 p.m., neither the witness, Mr. Costello, nor defendant, Mr. Forrest, whose promised arrival was noon, were present. At this point, the court informed all counsel that their conduct throughout this proceeding was substandard. The court held that Mr. Kornilowicz's right to call Mr. Costello had been waived for failure to subpoena him, failure to bring the alleged need for his presence to the court's attention, and failure to question the witness about the settlement when he being cross-examined. The court denied defendant's motion to enforce the alleged settlement agreement. The court found Mr. Kornilowicz's May 29, 1990 letter, especially paragraph four, patently ambiguous. It could just as easily restate BTI Corporation's ability to escape future penalties by timely payment of its contributions as it could refer to a waiver of outstanding liquidated damages and attorney's fees. The court construed the language against its drafter and found there had never been a settlement agreement. *In re F.H. McGraw & Co.*, 473 F.2d 465, 468 (3d Cir.1973) *cert. denied F.H. McGraw & Co. v. Fellows Corp.*, 414 U.S. 1022, 94 S.Ct. 443, 38 L.Ed.2d 312; *Commonwealth*

*v. Piscanio*, 511 Pa. 383, 515 A.2d 507 (1986). Under such circumstances even if Mr. Costello had testified, there is no way that he could have corrected defendant's ambiguity. The court then returned to the trial on the merits only to learn that Mr. Kornilowicz did not intend to present any evidence on the merits. The court accordingly expressed its views that it would have to enter judgment in favor of the Plaintiff Funds and against BTI Corporation, BTI Corporation having presented no evidence at all on the merits. (Record at 103). The court indicated that it would file a written opinion.[12]

### B. Liquidated Damages and Attorney Fees

The attorneys' briefs present confusing, and often inconsistent, arguments on the issues of liquidated damages and attorney's fees. This is in keeping with the feckless manner in which this entire case was litigated before the court. As described in part II.A.2 *supra*, the Complaint sought separate relief under ERISA and under the 1989 Agreement. In their motion for summary judgment and again at trial, plaintiffs' counsel asked only for $6,904.84 in liquidated damages assessed under the 1989 Agreement and reasonable attorney fees. However, in plaintiffs' memoranda supporting its motion for summary judgment and its response to defendant's motion for summary judgment, counsel argued for damages based on both ERISA and the 1989 Agreement. Because of the express provisions of the ERISA statutes, in fairness to the Plaintiff Funds, and because we believe plaintiffs' complaint was more accurately plead than the later motions were briefed, we will consider

---

damages and fees, and if BTI Corporation made timely *contribution* payments over six months, the remainder of the damages and fees would be waived. The fifteenth day of the month referred to the due date of the contribution payments, reflecting permission to pay monthly rather than weekly as prescribed by the 1989 Agreement.

11. Mr. Kornilowicz claimed that during a court recess he had informed Messrs. Kohn and Mc-Donald of his intention to call Mr. Costello as

part of BTI Corporation's case on the merits. None of the counsel present brought any of this to the attention of the court while Mr. Costello was on the witness stand, nor was Mr. Costello under a subpoena.

12. Although the court denied BTI Corporation's motion for summary judgment, in fairness we will consider the motion and accompanying brief as BTI Corporation's arguments against the imposition of liquidated damages and attorney's fees.

the Plaintiff Funds' claims for relief both under ERISA and the 1989 Agreement.

The delinquent contributions of which Plaintiff Funds have complained fall into three categories: 1) the delinquent contributions which were still unpaid at the time the complaint was filed, 2) the delinquent contributions which were paid by the time the complaint was filed, and 3) the delinquent contributions which arose after the complaint was filed, and which were paid before trial. We will address each in turn.

### 1. Delinquent Contributions Unpaid At Suit

■ ERISA, as amended by the Multiemployer Pension Plan Amendments Act of 1980, provides a federal cause of action for the collection of unpaid contributions owed to employee benefit plans.[13] ERISA § 515, 29 U.S.C.A. § 1145 (West 1985) states:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or agreement.

Section 1145 is strengthened by the remedial provisions of ERISA § 502(g), 29 U.S.C.A. § 1132(g) (West 1985), which reads in pertinent part:

> (2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the *court shall award* the plan—
>
> (A) the *unpaid contributions,*
>
> (B) the *interest on the unpaid contributions,*
>
> (C) an amount equal to the greater of—
>
> > (i) *interest on the unpaid contributions, or*
> >
> > (ii) *liquidated damages provided for under the plan* in amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) *of the amount determined by the court under subparagraph (A),*
>
> (D) *reasonable attorney's fees and costs* of the action, to be paid by the defendant, *and*
>
> (E) such other legal or equitable relief as the court deems appropriate.
>
> For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.

*Id.* (emphasis added).

"Unpaid" contributions have been interpreted to mean contributions outstanding at the time suit was begun.[14] *Idaho Plumbers & Pipefitters Health & Welfare Fund v. United Mech. Contractors, Inc.,* 875 F.2d 212, 215 (9th Cir.1989); *Bennett v. Machined Metals Co., Inc.,* 591 F.Supp. 600, 604 (E.D.Pa.1984), *cited with approval in Carpenters & Joiners Welfare Fund v. Gittleman Corp.,* 857 F.2d 476, 478 (8th Cir.1988). As discussed earlier, all BTI Corporation's contributions for October 1989 and some of its contributions for June 1989 and November 1989 were unpaid as of November 28, 1989, the date the complaint was filed. Furthermore, BTI Corporation cannot escape the penalties of § 1132(g)(2) by having paid the delinquent contributions after commencement of this action, but before judgment. *Carpenters Amended and Restated Health Benefit Fund v. Ryan*

---

**13.** There is no dispute that Plaintiff Funds are "multi-employer plans" and "employee benefit plans" within the meaning of 29 U.S.C.A. §§ 1002(3), 1002(37)(A) (West 1985), and the Plaintiff Funds are trust funds established under 29 U.S.C.A. § 186(c)(5) (West 1985).

**14.** Defendant's argument that the Complaint incorrectly stated the outstanding contributions thus depriving the Plaintiff Funds of their right to liquidated damages under ERISA is without

merit. The Plaintiff Funds were unable to calculate the exact amounts outstanding partly because BTI Corporation had failed to submit its remittance reports. Moreover, Count V requested judgment for contributions found to be delinquent after the Plaintiff Funds obtained the necessary information. If we adopted defendant's position, it would be impossible for most plaintiffs in cases such as this to recover anything.

*Constr. Co., Inc.*, 767 F.2d 1170, 1174 (5th Cir.1985). As provided by the Act, for these unpaid contributions, the Plaintiff Funds are clearly entitled to interest,[15] the greater of the interest or 10% liquidated damages, and attorney's fees and costs.

### 2. Delinquent Contributions Paid Before Suit

■ Next we consider the question of those delinquent contributions that were paid before the lawsuit was initiated. The May, June, July, and August 1989 contributions were all paid late, but before the complaint was filed on November 28, 1989. These contributions are not "unpaid" within the meaning of § 1132(g)(2), and are thus not entitled to ERISA interest, liquidated damages, and attorney's fees and costs. *Parkhurst v. Armstrong Steel Erectors*, 901 F.2d 796, 798 (9th Cir.1990); *Carpenters & Joiners Welfare Fund*, 857 F.2d at 478; *see also Bennett*, 591 F.Supp. at 604 (no ERISA liquidated damages unless there are "unpaid" contributions).[16]

■ Plaintiff Funds, however, also claim they are entitled to liquidated damages for these payments and attorney's fees under the 1989 Agreement.[17] We agree. *Idaho Plumbers & Pipefitters Health & Welfare Fund*, 875 F.2d at 216–17 (ERISA § 1132(g) does not preempt alternative contractual remedies); *Trustees of the Glaziers Local 963 Pension, Welfare, and Apprentice Funds v. Walker & Laberge Co.*, 619 F.Supp. 1402, 1405 (D.Md.1985) (assuming without discussion that ERISA did not preempt the trust agreements, court awarded interest and liquidated damages as provided for under the agreement).

When the House version of the ERISA amendments were reported out by the Committee on Ways and Means, the Committee said, "The Committee amendment does not change any other type of remedy permitted under State or Federal law with respect to delinquent multiemployer plan contributions." H.R.Rep. No. 869, 96th Cong., 2d Sess. Part II at 48–49, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918, 3037–3038, *quoted in Central States, Southeast & Southwest Areas Pension Fund v. Alco Express Co.*, 522 F.Supp. 919, 927 (E.D.Mich.1981). In floor debate, one of the House sponsors of the ERISA amendments made clear: "It is intended that the specific provisions of this section [Multi-employer Pension Plan Amendments Act § 306, ERISA §§ 515, 502(g) ] concerning interest and liquidated damages are limitations on the amounts otherwise set forth in collective bargaining agreements or plan documents; they constitute a minimum, not a maximum." 126 Cong.Rec. H7899 (daily ed. August 26, 1980) (statement of Rep. Thompson). Congress amended ERISA in 1980 to confront the problems of loss of investment income, excessive administrative costs, added burden on responsible employers, increase in unfunded liability, and unfairness to workers that delinquent employers posed to employee benefit plans. *See* Staff of Senate Comm. on Labor and Human Resources, 96th Cong., 2d Sess., S. 1076, The Multi-employer Pension Plan Amendments of 1980: Summary and Analysis of Consideration at 43–4 (Comm. Print 1980), *quoted in Central States*, 522 F.Supp. at 927.

We cannot believe Congress wanted to make things worse by voiding provisions of master agreements that penalize employers for late payments.[18] Without such protec-

---

**15.** As noted, the ERISA Act provides in § 502(g) that interest shall be determined by the rate provided under the plan. 1989 Agreement art. 16, sec. (a)(3)(c) appears to set a 6% interest rate for unpaid contributions making calculations under 26 U.S.C. § 6621 unnecessary. In the same ERISA section, similar provisions apply to liquidated damages which are set in the 1989 Agreement at 10%.

**16.** The *Bennett* court did award double interest under ERISA in a similar situation where the master agreement was identical to the ERISA

statute, however, it is difficult to say exactly why the court did so.

**17.** *See* 1989 Agreement, Plaintiffs' Exh. 1 at 20–21 (quoted in full in Part II.A.1. *supra* ).

**18.** We realize the Eighth Circuit has reached the opposite conclusion in *Carpenters & Joiners Welfare Fund v. Gittleman Corp.*, 857 F.2d 476 (8th Cir.1988). We believe this case did not adequately take congressional intent or common sense considerations into account. The Third Circuit has not yet spoken on this issue.

tion, union workers covered by funds such as the Plaintiff Funds could be routinely deprived of substantial interest through deliberate patterns of late, last minute payments and there would be nothing the funds could do about it. Accordingly, we believe that Plaintiff Funds are entitled to 10% liquidated damages, reasonable attorney's fees, and costs as provided for in the 1989 Agreement for the late May, June, July, and August 1989 payments paid before suit.

### 3. Delinquent Contributions Arising After Suit And Paid Before Trial

■ There remains the question of those contributions for the last half of November 1989, and for the months of December 1989, January, February, March, May, and June 1990. These obligations were not outstanding, most not even incurred, when the complaint was filed. Like the majority of BTI Corporation's payments, however, these contributions became delinquent and were paid weeks or months after they were due.

We have found no cases that present this factual situation, so we again look at ERISA and at the 1989 Agreement. Plaintiff Funds' complaint requested equitable relief in the form of an audit and both ERISA and contractual damages for contributions found to be due and owing. However, plaintiffs did not amend their complaint to include these later claims as unpaid.[19] We nevertheless believe that plaintiffs' audit requests in Count V are broad enough to permit us to include these later claims in our award. Such an approach provides a common sense and equitable method of handling a changing situation while avoiding a multiplicity of suits. It poses no prejudice for a defendant such as BTI Corporation which knows better than the Plaintiff Funds what they have paid and who has worked what hours. Since BTI Corporation paid the principal amount before trial, the contributions are not un-

paid at the time of judgment. These payments are not "unpaid" within the meaning of the ERISA statute. Regarding these payments, for the reasons stated above, we find Plaintiff Funds entitled to 10% liquidated damages, reasonable attorney's fees, and costs under the 1989 Agreement. To allow otherwise, would reward BTI Corporation for its delinquency and its lucky timing of paying its contributions before this court awarded judgment.

After trial, Plaintiff Funds filed a declaration of attorney's fees amounting to $17,653.55 and costs of $366.95. It has not been disputed that the Plaintiff Funds' attorneys actually worked 189.25 hours on this case or that the $90.00 hourly rate for Mr. McDonald, the attorney principally involved in the litigation, was reasonable. The court is mindful of the fact that three-quarters of the time and money invested in this case was devoted to the motion to enforce the "settlement" agreement, the TRO, and the trial. The attorneys' misunderstanding in May has resulted in an award of fees and costs almost three times greater than the liquidated damages in dispute. The saving grace, as the *Central States* court noted, is that BTI Corporation knew or should have known what was happening. By putting off fulfilling its statutory and contractual obligations to Plaintiff Funds, BTI Corporation allowed the Plaintiff Funds to accumulate legal fees and costs well knowing that a court could later order BTI Corporation to pay these fees and costs.

### III. CONCLUSIONS OF LAW

1. No enforceable settlement agreement was reached.

2. Plaintiff Funds are entitled to recover 6% interest, 10% liquidated damages, reasonable attorney's fees, and costs for all delinquent contributions unpaid at time of suit pursuant to the provisions of ERISA § 502(g), 29 U.S.C. 1132(g)(2).

---

19. During a trial conference at sidebar, the court went so far as to ask plaintiffs' counsel whether they wished to amend their pleadings in any way, and they declined. We are now powerless to amend the complaint for them.

*See In re Pinto,* 89 B.R. 486, 502 (Bankr.E.D.Pa. 1988) (although evidence presented may have supported claim of unjust enrichment, *debtor* did not plead this cause of action in the complaint, and court cannot amend *sua sponte* ).

3. Plaintiff Funds are entitled to recover 6% interest, 10% liquidated damages, reasonable attorney's fees, and costs pursuant to the 1989 Agreement for delinquent contributions paid before suit was filed.

4. Plaintiff Funds are entitled to recover 6% interest, 10% liquidated damages, reasonable attorney's fees, and costs under the 1989 Agreement for contributions that became delinquent after suit was filed, but were repaid before trial.

An appropriate order follows.

## ORDER

AND NOW, this 1st day of October, 1990, it is hereby ORDERED as follows:

1. Judgment is entered in favor of all plaintiffs and against defendant Building Tech, Inc. for liquidated damages in the amount of $6,683.88, attorney's fees in the amount of $17,653.55, and costs of $366.95. This judgment will be amended to include interest due to date upon submission by plaintiffs, within seven (7) days, of the proper 6% interest calculations consistent with the court's Decision.[20]

2. Judgment is entered in favor of defendant Harry Forrest and against all plaintiffs.

3. Defendant's Motion to Enforce Settlement is DENIED.

---

**20.** Plaintiff Funds failed to submit a breakdown of the monthly contributions preventing the court from computing an exact dollar amount for judgment.